IN RE the INTEREST OF Z.J.H.: Wendy L.
SPORLEDER, Petitioner-Appellant-Petitioner,

v.

Janice A. HERMES, Respondent.

Supreme Court

*No. 89-2113. Argued May 29, 1991.—Decided June 26, 1991.*

(Also reported in 471 N.W.2d 202.)

1004

For the petitioner-appellant-petitioner there were briefs by *Shelley J. Gaylord* and *Gaylord & Schuett,* Madison and oral argument by *Shelley J. Gaylord.*

For the respondent there was a brief by *Daniel R. Cross* and *Robinson, Robinson, Peterson, Berk,*

*Rudolph, Cross and Garde,* Appleton and oral argument by *Daniel R. Cross.*

There was an amicus curiae brief by *Mark Borns* and *Borns, Macualay & Jacobson,* Madison, of counsel, *Maria Gil de Lamadrid,* San Francisco, California and *Paula L. Ettlebrick,* New York, New York for National Center for Lesbian Rights and Lambda Legal Defense and Education Fund, Inc.

CALLOW, WILLIAM G., J.   This is a review of a decision of the court of appeals, *In re Interest of Z.J.H.,* 157 Wis. 2d 431, 459 N.W.2d 602 (Ct. App. 1990). In its decision, the court of appeals affirmed a summary judgment of the circuit court for Outagamie county, Judge Dee R. Dyer, dismissing an action by the petitioner-appellant-petitioner (Sporleder) seeking physical placement or visitation of Z.J.H., the adopted son of the respondent (Hermes). Sporleder seeks review of that decision, pursuant to sec. (Rule) 809.62, Stats.

Four issues are raised on this review: (1) Is Sporleder, who is not a natural or adoptive parent of Z.J.H., entitled to custody or physical placement of Z.J.H. under the **in loco parentis** doctrine?; (2) Does sec. 767.245(1), Stats., entitle Sporleder to visitation rights to Z.J.H. absent an underlying action affecting the family?; (3) Is a co-parenting contract between Sporleder and Hermes, the adoptive parent, enforceable by the courts when it concerns the physical placement of the child or visitation rights to the child?; and (4) Is Hermes equitably estopped from denying that Sporleder is an equitable parent of Z.J.H., and therefore entitled to custody of Z.J.H. or visitation with Z.J.H.?

We first conclude that Sporleder does not have standing to acquire custody[1] of Z.J.H. There is no allega-

---

[1]The co-parenting contract which the parties entered refers

tion that Hermes is either unfit or unable to care for Z.J.H., and Sporleder has not established that compelling reasons exist for awarding custody to a third party. Second, we conclude that Sporleder is not entitled to visitation rights with Z.J.H., because there is no underlying action affecting the family. Third, we conclude that the co-parenting contract between Sporleder and Hermes is unenforceable. The rights to custody and visitation are controlled by statutory and case law, and cannot be determined by contract. Finally, we conclude that Hermes is not equitably estopped from denying custody and visitation to Sporleder.

The relevant facts follow. Sporleder and Hermes lived together as companions for approximately eight years. After an unsuccessful attempt to have a child through the artificial insemination of Sporleder, they decided that Hermes would adopt a child. In March 1988, Z.J.H., born January 19, 1988, was placed in their home as a result of a pre-adoptive placement by an adoption agency. Sporleder provided the primary care for Z.J.H., while Hermes worked outside the home. On October 25, 1988, the parties entered a co-parenting agreement, in which they agreed, among other things, that if they separated they would determine the physical placement of Z.J.H. through mediation, and that the non-placement party would have reasonable and liberal visitation rights to the child.

Sometime in October 1988 the parties separated.[2] Hermes then formally adopted Z.J.H. in November 1988,

only to physical placement of Z.J.H. In her brief, Sporleder argues that she is entitled to legal custody and physical placement. Section 767.24(1), Stats., treats legal custody and physical placement similarly. In this opinion, we use the term "custody" to refer to both legal custody and physical placement.

[2]The agreement was executed after Sporleder and Hermes

and subsequently prohibited Sporleder from seeing Z.J.H.

In March 1989, Sporleder brought an action in the Outagamie county family court, seeking visitation rights or physical custody of Z.J.H., and seeking to enforce the co-parenting agreement. The family court commissioner granted visitation rights to Sporleder, and deferred to the circuit court on the other issues. The circuit court subsequently granted summary judgment for Hermes, on the grounds that Sporleder did not enjoy the legal status of parent, and had no standing to exercise these rights under *Van Cleve v. Hemminger,* 141 Wis. 2d 543, 415 N.W.2d 571 (Ct. App. 1987). The circuit court also found that the agreement was void as against public policy, and that Hermes was not equitably estopped from denying Sporleder's status as a parent.

The court of appeals affirmed the judgment of the circuit court, concluding that Sporleder was not entitled to custody or visitation rights to Z.J.H. We review the court of appeals decision pursuant to sec. (Rule) 809.62, Stats.

### I.

We first determine that Sporleder does not have standing[3] to sustain an action to obtain custody of

---

had separated. Hermes asserted, in her defense to the validity of the agreement, that she had signed it under duress caused by Sporleder's threats to interfere with her adoption of Z.J.H.

[3]The concept of standing, as it relates to custody actions, is not identical to the standing requirements for challenging an administrative agency ruling. *See Moedern v. McGinnis,* 70 Wis. 2d 1056, 1067, 236 N.W.2d 240 (1975), for a discussion of standing requirements in administrative agency decisions. Standing in custody cases has generally referred to whether an individual has status to bring an action for custody under the applicable statute.

Z.J.H. In reaching this conclusion, we first examine who has standing to bring an action for custody under the custody statute, sec. 767.24, Stats. Next, we examine whether Sporleder qualifies for such status under the statutory and common law of the state.

██

We conclude that, according to sec. 767.24(1), Stats., and this court's decision in *Barstad v. Frazier,* 118 Wis. 2d 549, 348 N.W.2d 479 (1984), a non-parent may not bring an action to obtain custody of a minor child unless the natural or adoptive parent is unfit or unable to care for the child, or there are compelling reasons for awarding custody to a third party. *Barstad,* 118 Wis. 2d at 568. *See also* J. McCahey, *Child Custody and Visitation Law and Practice,* sec. 11.03[1] (1991) (discussing the *Barstad* rule).

The general provisions concerning child custody and physical placement are found in sec. 767.24(1), Stats.[4] This section describes the circumstances under which the court may make custody and placement determinations for minor children. This case does not involve an action for annulment, divorce or legal separation between the parties. Conceivably, however, Sporleder

---

*See, e.g., Marshall v. Superior Court,* 145 Ariz. 309, 701 P.2d 567 (1985); *In re Custody of Barokas,* 109 Ill. App. 3d 536, 440 N.E.2d 1036 (1982); *Henderson v. Henderson,* 174 Mont. 1, 568 P.2d 177 (1977).

[4]Section 767.24(1), Stats., provides:

**Custody and physical placement. (1)** GENERAL PROVISIONS. In rendering a judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02(1)(e), the court shall make such provisions as it deems just and reasonable concerning the legal custody and physical placement of any minor child of the parties, as provided in this section.

may bring an action under sec. 767.02(1)(e),[5] if Z.J.H. is her "minor child."

Setting aside the question of Sporleder's status as a parent for now, it is helpful to examine the circumstances under which a non-parent can acquire standing to obtain custody of a minor child. First, under sec. 767.24(3), Stats., a relative can acquire custody, "[i]f the interest of any child demands it, and if the court finds that neither parent is able to care for the child adequately or that neither parent is fit and proper to have the care and custody of the child," under a child in need of protection or services (CHIPS) proceeding. Sporleder concedes that Hermes is not unfit or incapable of taking care of Z.J.H., and hence sec. 767.24(3) does not apply to this case.

Second, a third party can acquire custody of a minor child if "compelling circumstances" exist, which necessitate awarding custody to one other than the child's parent. We stated, in *Barstad:*

> We conclude that the rule to be followed in custody disputes between parents and third parties is that a parent is entitled to custody of his or her children unless the parent is either unfit or unable to care for the children or there are compelling reasons for awarding custody to a third party. Compelling reasons include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other similar extraordinary circumstances that would drastically affect the welfare of the child.

[5]Section 767.02(1)(e), Stats., provides:

**Actions affecting the family. (1)** Actions affecting the family are:

. . ..

(e)   Custody.

*Barstad,* 118 Wis. 2d at 568. We find no such conditions or extraordinary circumstances present here.

■

Sporleder contends that summary judgment was inappropriate in this case, because she was never given the opportunity to show that compelling circumstances existed, which would entitle her to custody over Hermes. Applying the procedure to be used in reviewing summary judgment orders,[6] we conclude that summary judgment was appropriate in this case. Reviewing the case as the circuit court did, and applying the standards of sec. 802.08(2), Stats., we conclude that the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits do not establish a genuine issue of material fact. The parties do not dispute that they entered a co-parenting contract. Neither do they disagree that Sporleder had a "parent-like" relationship with Z.J.H. Hermes, in her motion for summary judgment, conceded as much. There are no disputed material facts, or undisputed facts from which reasonable alternative inferences may be drawn. *See Grams,* 97 Wis. 2d at 338. The crucial question is whether these facts represent "compelling circumstances." We conclude, as a matter of law, that they do not.

Clearly, this case does not involve abandonment, persistent neglect of parental duties, or extended disruption of parental custody. Although Sporleder may have been the primary care provider, Z.J.H. was not separated from Hermes. Additionally, we do not find "similar extraordinary circumstances." *Barstad,* 118 Wis. 2d at

[6]We have detailed these procedures in numerous cases, including *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980); *Kraemer Bros. v. United States Fire Ins. Co.,* 89 Wis. 2d 555, 566–67, 278 N.W.2d 857 (1979); *Green Springs Farms v. Kersten,* 136 Wis. 2d 304, 314–15, 401 N.W.2d 816 (1987).

568. This case is vastly different from the case Sporleder primarily relies on, *LaChapell v. Mawhinney,* 66 Wis. 2d 679, 225 N.W.2d 501 (1975). In *LaChapell,* custody of two minor children was awarded to the children's grandparents over their natural father. In that case, the father had not lived with the children for eight years, had not displayed any interest in them, and had only visited them twice. *LaChapell,* 66 Wis. 2d at 684. Here, we find no such compelling circumstances to justify awarding custody to a third party.

Although Sporleder had cultivated a "parent-like" relationship with Z.J.H., and expected that relationship to continue, the focus of our decision in *Barstad* was that compelling circumstances existed when a deficiency existed in the relationship of the child with the natural parent that drastically affected the welfare of the child. *Barstad,* 118 Wis. 2d at 568. Such is not the case here.

■

Hence, we conclude that the conditions under which a third party can acquire custody of a minor child are not satisfied in this case. Unless Sporleder qualifies as a "parent" of Z.J.H., Z.J.H. is not a "child of the parties," sec. 767.24(1), Stats., and Sporleder does not have standing to acquire custody.[7]

Our second inquiry in resolving the custody issue is whether Sporleder may have standing as a "parent." "Parent" is undefined in ch. 767, Stats., although the term is used periodically throughout (e.g., sec. 767.25,

---

[7]This conclusion is also consistent with the Legislative Council Note—1979 to sec. 767.015, Stats., which states:

> When the court finds that neither *parent* is able to provide the child with adequate care or that neither *parent* is a fit and proper person to have custody of the child, it may transfer custody . . . .. (Emphasis added.)

Child Support; sec. 767.327, Moving the Child's Residence Within or Outside the State).

Sporleder claims the status of a parent, based on a theory of "**in loco parentis.**"[8] Sporleder relies on *In re Custody of D.M.M.*, 137 Wis. 2d 375, 404 N.W.2d 530 (1987), in which we addressed sec. 767.245(4), Stats. 1985-86 (now sec. 767.245(1)), Visitation. In *D.M.M.*, we stated, in dicta: "In Webster's Third New International Dictionary (1967), in addition to other meanings, parent is defined as 'a person standing in loco parentis although not a natural parent.' " *D.M.M.*, 137 Wis. 2d at 385.

Our holding in *D.M.M.*, however, is unrelated to our holding today. In *D.M.M.*, the issue was whether the circuit court could grant visitation rights to any persons other than those named in sec. 767.245(4), Stats. 1985-86, namely, parents, grandparents or great grandparents. In *D.M.M.*, a visitation dispute arose between F.P.R., D.M.M.'s aunt, and J.M., D.M.M.'s mother.

---

[8] **In loco parentis** is defined as "[i]n the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities." Black's Law Dictionary, 787 (6th ed. 1990). The literature uses several expressions to describe one who, although not the natural or adoptive parent, stands in the shoes of that parent. *See, e.g., Alyson D. v. Virginia M.,* 1991 WESTLAW 66523 (NY) ("**de facto**" parent); *Nancy S. v. Michele G.,* 228 Cal. App. 3d 831, 279 Cal. Rptr. 212 (1991) ("psychological" parent); *Atkinson v. Atkinson,* 160 Mich. App. 601, 408 N.W.2d 516 (1987) ("equitable" parent). These terms are often used synonymously, although there are several legal distinctions. *See Nancy S.,* 228 Cal. App. 3d 831, 279 Cal. Rptr. 212. For purposes of this opinion, we use the term "**in loco parentis**" to describe an individual with a parent-like relationship with the child for custody purposes, and the expression "equitable parent" to describe an individual who has the rights of a natural parent through equitable estoppel.

F.P.R. had been D.M.M.'s court-appointed guardian until June 5, 1984. When the guardianship was discharged, the circuit court also denied visitation rights to F.P.R. After F.P.R. petitioned for visitation rights, J.M. moved to dismiss on the ground that F.P.R. had not stated a claim under sec. 767.245(4), because she was not a grandparent or a great grandparent.

We found that the use of the term "parent" in sec. 767.245(4), Stats. 1985-86, was ambiguous, and could also include someone **in loco parentis.** *D.M.M.,* 137 Wis. 2d at 385. However, we also concluded that the statute could alternatively be limited to natural parents only. *Id.* at 386. Ultimately, we left "parent" undefined, concluding that F.P.R. had standing to acquire visitation rights under sec. 767.245(4), based on our conclusion that the legislature did not intend to supplant the common law by limiting visitation to parents, grandparents and great grandparents. *Id.* at 390. Hence, F.P.R. acquired standing to pursue visitation rights not as a "parent," but as an "other person."[9]

This court has never applied an "**in loco parentis**" approach to custody actions. Such a theory is inconsistent with this state's adherence to the "parental preference" standard (also called the "parental right" standard) in the resolution of custody disputes. *See* J. McCahey, *supra,* at sec. 11.03[1]. *See also Barstad,* 118 Wis. 2d at 568-69. The "parental preference" rule gives great deference to the rights of parents such as Hermes to raise their children. *Id. See also Ponsford v. Crute,* 56 Wis. 2d 407, 413, 202 N.W.2d 5 (1972); *Sommers v. Sommers,* 33 Wis. 2d 22, 26, 146 N.W.2d 428 (1966).

---

[9]Section 767.245(4), Stats. 1985-86, has been renumbered and amended since *D.M.M.,* to include persons such as F.P.R. *See* current sec. 767.245(1). 1987 Act 355 sec. 38.

While this rule recognizes the rights of children, it also assumes that normally it is in the best interests of the child to be raised by his or her parent. In *Barstad*, we stated, "[u]nder ordinary circumstances, a natural parent has a protected right under both state law and the United States Constitution to rear his or her children free from governmental intervention." *Barstad*, 118 Wis. 2d at 567. *Barstad* recognized the constitutional rights of the natural parent, rather than the third party. In United States Supreme Court cases which have found a constitutionally protected interest in a parental relationship with the child, each case has involved a natural parent. *See Caban v. Mohammed*, 441 U.S. 380 (1979); *Stanley v. Illinois*, 405 U.S. 645 (1972). While these and other cases (*see, e.g., Michael H. v. Gerald D.*, 109 S. Ct. 2333 (1989); *Lehr v. Robertson*, 463 U.S. 248 (1983); *Quilloin v. Walcott*, 434 U.S. 246 (1978)) have required a relationship beyond a biological one to create a constitutionally protected interest, none has suggested that an individual who stands **in loco parentis** acquires such an interest. On the contrary, to the extent that we award custody rights to one who stands **in loco parentis** as Sporleder urges, we diminish the rights of legal parents such as Hermes.

Sporleder cites *Thelen v. Catholic Social Services*, 691 F. Supp. 1179 (E.D. Wis. 1988), for the proposition that individuals who do not have a biological relationship with the child can still have a protected liberty interest in that relationship under the Fourth Amendment to the United States Constitution.

*Thelen* is distinguishable from this case. In *Thelen*, the court stated: "The narrow issue before the Court is whether prospective adoptive parents with whom a child has been placed have a Due Process right under the United States Constitution to a hearing prior to the

removal of the child during the initial six-month period of placement." *Thelen,* 691 F. Supp. at 1180. That court concluded, "the prospective adoptive couple has a limited, but not wholly insignificant, constitutionally protected liberty interest in their family unit during the initial six-month period that a child is placed in their home." *Id.* at 1185. The Thelens had a reasonable expectation under the adoption statutes that they would eventually acquire legal parental status of the to-be-adopted child. *Id.* at 1184. Sporleder may have had a reasonable expectation that her status as care provider would continue, but there was no indication that she would acquire legal parental status. Hence, hers is not a protected liberty interest.

The legislative history behind ch. 767, Stats., also supports this conclusion. Sections 767.24 and .245 were both substantively revised in 1987. 1987 Wis. Act 355, secs. 25–38. Section 767.24(1)(c) was renumbered to sec. 762.24(3)(a), and amended to refer to "parent," rather than "party." Section 28. Section 767.245(4) was renumbered to sec. 767.245(1), and amended to include a "person who has maintained a relationship similar to a parent-child relationship with the child," as persons who may petition for visitation rights. Section 38. This language is particularly instructive. It demonstrates that the legislature did not intend to preclude such persons from visitation rights, as we stated in *D.M.M.* It also demonstrates that the legislature was cognizant of the concerns of individuals such as F.P.R. and Sporleder. As we stated in *State v. Welkos,* "where a statute with respect to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant in showing that a different intention existed." *Welkos,* 14 Wis. 2d 186, 192, 109 N.W.2d 889 (1961). The legislature could have, but

did not broaden sec. 767.24(1) to include parent-like individuals such as Sporleder. Nor did the legislature broaden sec. 767.24(3)(a) to include these individuals. Finally, the legislature could have easily included a definition of "parent" in sec. 767.001, a definitional section created by 1987 Wis. Act 355. *See* sec. 11.

This definitional omission is significant in light of sec. 48.02, Stats. Section 48.02 is a definitional section in the Children's Code, and provides: " 'Parent' means either a biological parent, a husband who has consented to the artificial insemination of his wife under s. 891.40, or a parent by adoption." Section 48.02(13). While this definition applies to ch. 48, and not specifically to ch. 767, sec. 48.02 in general is referenced throughout ch. 767. (*See, e.g.,* sec. 767.001(2)(b); sec. 767.24(3)(a)). While we do not suggest that the definition of "parent" in sec. 48.02(13) controls every reference to "parent" in ch. 767, the fact that sec. 48.02 is referenced in ch. 767 is evidence of the fact that the legislature was aware of sec. 48.02 at the time 1987 Wis. Act 355 was enacted, and could have created a distinct definition of "parent" under ch. 767, had it so intended.

In holding that Sporleder does not have standing to obtain custody of Z.J.H., we also recognize the public policy consideration of limiting the number of individuals with whom a child is placed, in order to promote stability in that child's life. Were we to permit individuals standing **in loco parentis** to obtain custody, as Sporleder urges us to do, we would open the doors to multiple parties claiming custody of children by virtue of their **in loco parentis** status. Without limitations as we have discussed today, a child could have multiple "par-

ents,"[10] and could find himself or herself subject to multiple custody and visitation arrangements. Although Sporleder suggests a framework wherein the group of "parents" would take into consideration the intent of the natural/adoptive parent, we nonetheless envision situations where a child could be in such an unstable environment. It would be virtually impossible to ensure equity to all parties and protect the best interests of the child under such a scenario. The California Court of Appeals appropriately stated: "We do not, however, agree that the only way to avoid such an unfortunate situation [the suffering a child such as Z.J.H. may endure as a result of his separation from Sporleder] is for the courts to adopt appellant's novel theory by which a nonparent can acquire the rights of a parent, and then face years of unraveling the complex practical, social, and constitutional ramifications of this expansion of the definition of parent." *Nancy S.,* 279 Cal. Rptr. at 219. While our decision today may result in occasional unfortunate consequences for minor children who have developed relationships with individuals claiming standing under the doctrine of **in loco parentis,** the legislature deliberately spared the legal system from an obligation to discern a just result from among the myriad of circumstances in which individuals could claim rights under the **in loco parentis** doctrine.

Most of the cases dealing with custody disputes involve biological parents. Hermes is the adoptive mother of Z.J.H. As such, she has all the "rights, duties and other legal consequences of the natural relation of child and parent." Section 48.92, Stats. These "rights, duties and other legal consequences" include the right to

---

[10]It is also difficult to restrict the individuals who may qualify under an **in loco parentis** status. Housekeepers, prior companions, day-care providers and others could conceivably qualify.

custody as a parent of the child, sec. 767.24(1), Stats., and the freedom from governmental intervention unless sec. 767.24(3)(a) or other compelling circumstances apply. *Barstad,* 118 Wis. 2d at 567. The child has a right of inheritance from his adoptive parent under sec. 851.51, Stats. In essence, Hermes has the rights of a natural parent, and is entitled to the presumption that as between a natural parent and a third party, the " 'best interests of the child' lie with the natural parents' exercise of custodial rights." *State ex rel. Lewis v. Lutheran Social Services,* 59 Wis. 2d 1, 13, 207 N.W.2d 826 (1973). Sporleder is not entitled to this presumption as she is not legally a "parent" of Z.J.H.[11]

---

[11]Much of our case law and statutory language reflects the traditional manner in which custody disputes arise, i.e., between two natural parents in a divorce or annulment action. *See, e.g.,* secs. 767.001(1) and 767.24(2), Stats. (which concern joint custody); sec. 767.24(3)(a) (which discusses *neither* parent); *Sommers,* 33 Wis. 2d at 26 (discussing natural parents). Unmarried couples do not fit neatly within the custody statutes because they cannot participate in divorce (secs. 767.07 and .12(2)), annulment (sec. 767.03) or legal separation (secs. 767.07 and .12(2)) proceedings, proceedings which stem from a marital relationship. We have not addressed the question of whether two unmarried individuals can both adopt a child, although other courts have prohibited such a dual adoption under similar statutory schemes. *See Adoption of Meaux,* 417 So. 2d 522 (La. App. 1982); *In re Jason C.,* 129 N.H. 762, 533 A.2d 32 (1987). The applicable language in sec. 48.82, Stats., indicates only that: "The following persons are eligible to adopt a minor if they are residents of this state: (a) A husband and wife jointly, or either the husband or wife if the other spouse is a parent of the minor. (b) An unmarried adult." Whether two unmarried individuals should be able to adopt (or assume any of the other legal rights and responsibilities now reserved for married individuals) is a legislative question.

## II.

Sporleder is also not entitled to visitation rights under sec. 767.245(1), Stats.[12] While this section does not specifically preclude such an action by a third party, a review of our case law leads to the inescapable conclusion that there must be an underlying action affecting the family unit before the provisions of sec. 767.245(1) are implicated. As we have held, Sporleder does not have standing to bring a custody action. Additionally, there is no other action affecting the family unit (e.g., divorce, CHIPS) in this case. We discussed the predecessor statute to sec. 767.245(1), sec. 767.245(4), Stats. 1985–86, in *In re Marriage of Soergel,* 154 Wis. 2d 564, 453 N.W.2d 624 (1990). Although the language in the predecessor statute did not refer to "person[s] who [had] maintained a relationship similar to a parent-child relationship with the child," we recognized that this language was added by the legislature to expand this provision to include such individuals. *Soergel,* 154 Wis. 2d at 567 n.2.[13] There is no indication that the legislature intended to allow visitation against parental wishes in the absence of actions affecting the marriage. We concluded, in *Soergel,* that the legislature intended to codify earlier judicial

---

[12]Section 767.245(1), Stats., provides:

**Visitation rights of certain persons. (1)** Upon petition by a grandparent, greatgrandparent, stepparent or person who has maintained a relationship similar to a parent-child relationship with the child, the court may grant reasonable visitation rights to that person if the parents have notice of the hearing and if the court determines that visitation is in the best interest of the child.

[13]In *Soergel,* this language was inconsequential because the petitioners who sought visitation rights were grandparents, and potentially entitled to visitation rights under either the former or current statutes.

decisions in enacting sec. 767.245(4). *See Weichman v. Weichman,* 50 Wis. 2d 731, 184 N.W.2d 882 (1971); *Ponsford,* 56 Wis. 2d 407. We stated, "[t]he history of sec. 767.245(4), Stats., shows the legislature intended to codify this court's decisions in *Weichman* and *Ponsford;* therefore, this provision applies in divorce or custody cases or in other actions affecting the marriage." *Soergel,* 154 Wis. 2d at 573. This case, as in *Soergel,* does not involve an action affecting the marriage.

We also addressed the negative impact that a grant of visitation rights would have on an adoptive parent, such as Hermes. We stated, "adoption effects 'a complete substitution of rights, duties, and other legal consequences of the natural relation of child and parent and kin with those same rights, duties, and legal consequences between the adopted person and the adoptive parents and kin.' " *Id.* (quoting *Estate of Topel,* 32 Wis. 2d 223, 227, 145 N.W.2d 162 (1966)). One of the rights an adoptive parent acquires, we stated, "is the right to determine whether a relationship with the grandparents, or any other person, is contrary to the child's best interests." *Id.* at 574. Here, as there, we conclude that it is for the adoptive parent Hermes, not the court, to decide whether visitation with Sporleder is in Z.J.H.'s best interests, and sec. 767.245(1), Stats., was not intended to interfere with that right. *See id.*[14]

---

[14]We recognize the rights of adoptive parents based on legal precedents. The dissent passionately but unfairly portrays this decision as one which ignores the rights of children in "nontraditional" relationships. (Bablitch, J., dissenting op. at 1031.) Without support other than its own reading of sec. 767.245, Stats., the dissent concludes that the legislature "could not have intended such an absurd and cruel result," *id.,* apparently having already concluded that the court, rather than a fit legal parent should determine visitation rights in situations such as this.

Finally, in *Soergel,* we referred approvingly to *Van Cleve,* 141 Wis. 2d 543, a case in which the court of appeals defined the purpose and scope of the visitation statute. *Soergel,* 154 Wis. 2d at 571. In *Van Cleve,* the court of appeals stated, "[i]t is obvious from these analyses that the legislature did not intend that the state intervene in the parents' decision regarding their children's best interests when the family unit is intact." *Van Cleve,* 141 Wis. 2d at 549. Consequently, the court of appeals refused to extend the application of sec. 767.245(4) beyond cases where an underlying action affecting the family unit had been filed. *Id.* In arguing that Hermes and Z.J.H. do not represent an "intact family," Sporleder misses the point of *Van Cleve* and *Soergel.* The rationale behind these cases was that the legislature did not intend to override a parent's determination of visitation unless an underlying action affecting the family unit had been filed, because in such an instance, ordering visitation with non-parents may help to mitigate the trauma and impact of a dissolving family relationship. *Soergel,* 154 Wis. 2d at 571–72; *Van Cleve,* 141 Wis. 2d at 549. The presence of an intact family unit merely signals the absence of a dissolving family relationship.

In this case, whether the conclusion results from (a) the characterization of Hermes and Z.J.H. as an "intact family unit," or (b) the absence of an underlying action

In arguing for a different reading of sec. 767.245, Stats., the dissent basically asks that we confer the legal status of "parent" on both companions in a "non-traditional" relationship. We refuse to do so for the reasons articulated in this decision. Z.J.H. is not a "victim[ ] of parental warfare," *id.* at 1033, because Sporleder is not a "parent." In light of legal precedents, we do not confer that status on her today.

affecting the family unit, the same result occurs: there is no authority for Sporleder to petition for visitation rights.

While Sporleder insists that the legislature intended to change the purpose and scope of sec. 767.245(4), Stats. 1985–86, when it was amended, we find her arguments unpersuasive. First, the legislature can be presumed to have been aware of *Van Cleve* when sec. 767.245 was amended in 1987 (1987 Wis. Act 355). *See Zimmerman v. Wisconsin Elec. Power Co.,* 38 Wis. 2d 626, 634, 157 N.W.2d 648 (1968). The legislature could have, had it so intended, amended sec. 767.245(4) to allow visitation rights to such third parties in light of *Van Cleve*'s finding that the legislature did not intend that the state intervene in the parents' decision regarding their child's best interests when the family unit was intact and no underlying actions affecting the family unit had been filed. *Van Cleve,* 141 Wis. 2d at 549. Second, in *Soergel,* we recognized that the statute had been amended to include stepparents and individuals who had maintained a parent-like relationship with the child. We recognized that the language of sec. 767.245(4) was amended for the very purpose of granting visitation rights to these individuals. *Soergel,* 154 Wis. 2d at 567 n.2. The intent, therefore, was to include stepparents and parent-like individuals in the group of people who may qualify for visitation rights to a minor child when an underlying action affecting the marriage existed. The legislature did not express an intent to grant this group visitation rights to a child in an intact family unit.

## III.

We next conclude, as did the court of appeals, that rights to custody and visitation are controlled by statu-

tory and case law, and cannot be contracted away. "When the legislative will is expressed in peremptory terms of a statute it is paramount and absolute and cannot be varied or waived by the private conventions of the parties." *Grams v. Melrose-Mindoro Jt. School Dist. No. 1,* 78 Wis. 2d 569, 578, 254 N.W.2d 730 (1977). Because we conclude that the legislative intent grants custody and visitation rights to non-parents only under the circumstances described above, the contract is void to the extent it purports to award custody or grant visitation rights to Sporleder.

Additionally, in light of the societal and constitutional interests in maintaining the relationship between a natural or adoptive parent and that parent's child, public policy concerns militate against contractual provisions affecting this relationship.

This court has recognized the public interest in protecting not only the rights of the natural or adoptive parent, but of the family unit as well. *Barstad,* 118 Wis. 2d at 568. Hermes, as the legal parent, has all the rights and responsibilities which the law confers. She is legally responsible for the well-being of Z.J.H., and there is no indication that she has not fulfilled that responsibility. We have said that the court should not displace a fit and able parent for one who does not have the legal status of a parent, even if such a person could do as good a job or even a better job of parenting. *See id.* at 567–68. The co-parenting agreement, to the extent that it purports to award custody or grant visitation rights to Sporleder, is inconsistent with legislative intent behind the custody and visitation statutes, which prefer parents over third parties. It is also inconsistent with our conclusion that, unless circumstances compel a contrary conclusion, it is in Z.J.H.'s best interest to live in his legal parent's home. *See LaChapell,* 66 Wis. 2d at 683.

We stated, in *Stickles v. Reichardt,* 203 Wis. 579, 582, 234 N.W.2d 728 (1931), "in the absence of a statute, contracts of a parent by which a parent attempts to transfer permanently the custody of his child to another are invalid as contrary to public policy." While the purported transfer in *Stickles* would have not resulted in a permanent transfer of the child, it would "if given effect impair the adoptive parents' right to the custody of their child and might in its effect greatly impair the new parent-child relationship with very undesirable consequences to the child." *Stickles,* 203 Wis. at 582. Finally, we stated, "[t]he adoptive parents can no more barter away their rights in their adopted child or modify its status by contract than could a natural parent under the same or similar circumstances." *Id.* at 583.

We conclude that because of the public interest in maintaining a stable relationship between a child and his or her legal parent, the co-parenting agreement, to the extent that it purports to award custody or grant visitation rights to Sporleder, is unenforceable. While we recognize that Sporleder may have had a reasonable expectation that she would have continued contact with Z.J.H. under the agreement, enforcing the agreement would be contrary to legislative intent and the public interest.

## IV.

Finally, Hermes is not equitably estopped from denying that Sporleder is a parent of Z.J.H. The legal effects and consequences of statutory limitations cannot be avoided by estoppel. *Grams,* 78 Wis. 2d at 578. *See also Utschig v. McClone,* 16 Wis. 2d 506, 509, 114 N.W.2d 854 (1962) (quoting 19 Am. Jur. Estoppel, 639

sec. 40) ("The effect of an estoppel **in pais** is to prevent the assertion of what would otherwise be an unequivocal right. . . . Such an estoppel operates always as a shield, never as a sword. . . . [A]nd it does not of itself create new rights."). Sporleder cannot use the theory of equitable estoppel to create rights to custody or visitation to Z.J.H.

The primary case upon which Sporleder relies, *In re Paternity of D.L.H.*, 142 Wis. 2d 606, 419 N.W.2d 283 (Ct. App. 1987), is dissimilar. In *D.L.H.*, the court of appeals concluded that, for purposes of establishing a right to a relationship with the child born to his wife but fathered by another man, the husband may utilize the status of "equitable parent"[15] to assert an equitable estoppel defense against the child's mother instituting paternity proceedings against him. *D.L.H.*, 142 Wis. 2d at 617. In *D.L.H.*, the husband used the equitable estoppel defense as a shield, to protect his right to a relationship with the child. Such is not the case here. Equitable estoppel has not been invoked in Wisconsin against a natural/adoptive parent for the purpose of awarding custody to a non-parent.[16] *See Nancy S.*, 279 Cal. Rptr. at 217–19.

---

[15]The *D.L.H.* court was careful to point out that it was not addressing whether the "equitable parent" doctrine operated to elevate the husband in a divorce proceeding from a third-party status to that of a natural parent. *D.L.H.*, 142 Wis. 2d at 617.

[16]Two cases upon which Sporleder relies, *A.M.N. v. A.J.N.*, 141 Wis. 2d 99, 414 N.W.2d 68 (Ct. App. 1987); *In re Marriage of L.M.S. v. S.L.S.*, 105 Wis. 2d 118, 312 N.W.2d 853 (Ct. App. 1981), both involved cases where a husband of a wife who bore a child by another man attempted to escape his support obligations. These cases did not attempt to establish an affirmative right to custody, as is the case here.

We also distinguish *In re Marriage of D.L.J. and R.R.J.,* 162 Wis. 2d 420, 469 N.W.2d 877 (Ct. App. 1991). In that case, a child (J.L.J.) was born to D.L.J. and R.R.J. while they were married. During divorce proceedings, D.L.J. (the mother) moved the family court commissioner to order R.R.J. (the husband) to submit to blood tests, on the ground that D.L.J. had had sexual intercourse with two other men during the conceptive period and did not believe that R.R.J. was the father of J.L.J. (It was not until R.R.J. filed a motion for custody of J.L.J. that D.L.J. first claimed that R.R.J. was not the child's natural father.) The blood tests excluded R.R.J. as J.L.J.'s father, and the family court commissioner terminated visitation between J.L.J. and R.R.J. The circuit court, finding that R.R.J. was not the biological father of J.L.J., also denied visitation between J.L.J. and R.R.J.

Subsequently, the court of appeals held that R.R.J. had the status of "equitable parent," and that D.L.J. was equitably estopped from seeking a declaration that R.R.J. was not J.L.J.'s natural parent. *D.L.J.,* 162 Wis. 2d 420, 426, 427. The fact that R.R.J. had the status of a "natural parent" prior to D.L.J.'s motion and the subsequent blood test makes this case distinguishable.[17] Sporleder never had the status of "natural parent." Unlike *D.L.J.,* there was no revelation by Hermes that

---

[17]Another distinguishing factor is the fact that the child in *D.L.J.* was born into an existing marriage. Many courts have concluded that a man married to a woman at the time she delivers a child fathered by another man may acquire custody of that child under an "equitable parent" theory. *See* Annotation, *Parental Rights of Man Who is Not Biological or Adoptive Father of Child But was Husband or Cohabitant of Mother When Child was Conceived or Born,* 84 ALR 4th 655 (1991), and cases cited therein.

Sporleder was not a parent to the child. In contrast, Sporleder never believed that she was a "natural parent" to Z.J.H. Although Sporleder may have assumed parent-like responsibilities for the care of Z.J.H., at no time did she or Hermes believe that she had the legal status of parent. Consequently, she did not acquire the status of "equitable parent" as did R.R.J.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). The parties entered into a written express contract for the care and financial support of a child. In all-encompassing, broad language, the majority opinion declares that contractual provisions affecting visitation and the relationship between a parent and child are against public policy. Majority op. at 1024. Common sense tells us that the majority opinion cannot be correct.

Numerous contracts exist for the care and financial support of children; numerous contracts affect the parental relationship. These contracts are not per se against public policy. Although statutes govern visitation and support of children under certain circumstances, the statutes do not expressly or impliedly bar parents from entering into agreements about the physical placement, care and financial support of a child that protect the best interests of the child.

Wisconsin courts have long recognized the importance of freedom of contract and have endeavored to protect the right to contract. When a claim is made that an agreement is not enforceable because it violates public policy, the court must first precisely define the relevant public policy or public interest and the source of that policy or interest. The court must then determine

whether there is a conflict between that policy or interest and the agreement in question. Lastly, the court must determine what remedy would best serve the public interest. This kind of analysis prevents courts from refusing to enforce agreements on the basis of a court's amorphous notions of public good.

Thus a declaration that an agreement is against public policy should be made only after a careful balancing, in light of all the circumstances in the case, of the public policies favoring enforcement of a particular promise against the public policies disfavoring enforcement. *Watts v. Watts,* 137 Wis. 2d 506, 521, 405 N.W.2d 305 (1987). The Restatement (Second) of Contracts sets forth a balancing test.[1]

The majority opinion does not make this careful balancing. It cannot, because it has not fully analyzed the public policy implications of the agreement in this case. This court's cases and the statutes are clear that the best interests of the child is a dominant public policy in family matters. We do not know whether circumstances relating to the best interests of the child might, for example, warrant a court's granting visitation rights under the agreement in this case. *Cf. Barstad v. Frazier,* 18 Wis. 2d 549, 568–569, 348 N.W.2d 479 (1984) (no agreement; custody); *LaChappell v. Mawhinney,* 66 Wis. 2d 679, 683–684, 225 N.W.2d 501 (1975) (no agreement; custody). In analyzing an agreement affecting the right of custody of a minor, section 191 of the Restatement (Second) of Contracts, concludes, for example, that the agreement "is unenforceable on grounds of public policy unless the disposition as to custody is consistent with

---

[1]For a statement of this balancing test, see 2 Restatement (Second) of Contracts sec. 178 (1979). See also sec. 179 of the Restatement for the bases of public policies against enforcement of an agreement.

the best interests of the child."[2]

Furthermore the majority decides the best interests of the child in this case without having all the facts. The case is before us on summary judgment. The circuit court should determine the best interests of the child after a full hearing.

I conclude that the case should be remanded for a hearing and that the circuit court should consider such public policies as protection of freedom of contract, protection against impairment of family relations, and the best interests of the child in determining whether any part of the agreement affecting the child should be enforced.

The court cautioned in *Stickles v. Reichardt*, 203 Wis. 579, 583, 234 N.W. 728 (1931), upon which the majority opinion relies so heavily, that the court must consider the best interests of the child, rather than the validity of the contract, in ruling on contracts concerning children.[3] Thus the *Stickles* case is distinguishable

[2]Illustration 1 of sec. 191 states that when parents agree to give up custody of their child to C, a stranger, in return for C's promise to support the child, the promises are unenforceable unless the court finds that these promises are consistent with the best interest of the child.

The Comment states that similar rules apply to visitation. Restatement (Second) of Contracts, sec. 191, p. 59 (1979).

[3]"A great deal of the confusion which exists in the cases arises from the fact that there has been a failure to distinguish between the validity of a contract as such and the consequences to the child which have arisen by reason of the making of the contract. In determining matters having to do with the custody of the children, the primary question is, What is for the best interest of the child? Where a parent has voluntarily contracted away his rights and the child as a result has formed new attachments, it may very well be that a situation has been created which a court will hesitate to disturb, not on the principal ground that the

from this case on its facts and moreover does not support the reasoning of the majority opinion.

To comply with this court's numerous cases declaring the state's public policies of freedom of contract, protection against impairment of family relations and the best interests of the child, the court should, I believe, remand the case to the circuit court to examine the terms of the agreement and the circumstances of the parties and the child. The circuit court should enforce those parts of the agreement, if any, the circuit court concludes are in the best interests of the child and violate no defined public policy.

For the reasons set forth, I dissent.

William A. Bablitch, J. (dissenting). Everyone agrees that children of a dissolving traditional relationship deserve and need the protection of the courts. Yet the majority opinion holds that children of a dissolving non-traditional relationship are not entitled to the same protection. What logic compels that result? The legislature could not have intended such an absurd and cruel result, but that is what the majority of this court has determined.

Media accounts, and the majority opinion, focus solely on the rights of the adults in this non-traditional relationship that is dissolving. Lost in the media accounts, and in the majority opinion, are the interests

---

contract was valid or invalid, but because, everything considered, the welfare of the child demands the continuance of the relationship. In many cases language is used which indicates that the court's conclusion is based upon the contractual rights of the parties as such, but in reality that is only one factor in a number of factors which leads the court to the conclusion that best interests of the child requires its custody to be left where the contract placed it." *Stickles v. Reichardt,* 203 Wis. at 583.

of at least equal if not paramount concern: the interests of the child.

What about the child, Z.J.H.? Who speaks for him? What is in his interest? The majority denies him any legal significance. He is a nonentity in this battle between two parents. Because this is a non-traditional parental relationship, the result of the majority's decision is that the child's interests will not even be considered. It is as if he does not even exist.

But the child does exist. And thousands of others like him do exist. These children need, and deserve, the protection of the court as much as children of a dissolving traditional relationship. Their interests at least ought to be considered.

The majority opinion relies on *Van Cleve v. Hemminger,* 141 Wis. 2d 543, 415 N.W.2d 571 (1987). *Van Cleve* is a well reasoned opinion. It involved children of a traditional relationship. The underlying rationale of *Van Cleve,* which cannot be disputed, is that children of a dissolving relationship need and deserve the protection of the court lest they become mere pawns in the conflict between the parents. As the majority recognizes, majority op. at 1022, "ordering visitation with non-parents may help to mitigate the trauma and impact of a dissolving family relationship." Why that rationale does not apply equally to the children of a dissolving non-traditional relationship escapes me. These children, too, need and deserve protection.

The legislature could not and did not intend such a result. Almost the entire focus of 1987 Wis. Act 355, which amended the statute considered here, was on the importance of the interests of children in relationships that are dissolving. The Wisconsin legislature, in sec. 767.245, Stats.[1], clearly intended that Wisconsin courts

[1] **767.245 Visitation rights of certain persons. (1)** Upon

consider whether visitation is in the best interests of the child if the person seeking visitation establishes that his or her relationship with the parent has recently dissolved and she or he had a relationship similar to a parent-child relationship with the child.

It is a legal truism that "hard cases make bad law." This appears to be just such a case. The majority has written into the statute an exception where none exists. The majority ignores the reality that children of non-traditional relationships are just as likely to become victims of parental warfare in a dissolving relationship as are any other children. The facts of this case are a testament to that.

The majority in determining that under these facts there is no relief available has taken on what should in future cases be the role of the trial court. Undoubtedly the majority's result is greatly influenced by the facts. The child was in the parties' home for approximately seven months. Hermes formally adopted the child after the parties separated. The co-parenting agreement was not entered into until after the couple had separated. Different facts would, it is hoped, yield a different result. The legal facade adopted by the majority cannot withstand scrutiny under stronger facts: the results in too many cases would be much too onerous. Accordingly, I cannot accept the majority's opinion as a prediction of what the holdings of this court will be in future cases involving children of non-traditional relationships.

---

petition by a grandparent, greatgrandparent, stepparent or person who has maintained a relationship similar to a parent-child relationship with the child, the court may grant reasonable visitation rights to that person if the parents have notice of the hearing and if the court determines that visitation is in the best interest of the child.

(2) Whenever possible, in making a determination under sub. (1), the court shall consider the wishes of the child.

The courts of this state should provide the same protection for all children whose happiness and stability is affected by a dissolving relationship. I would remand this case to the trial court to determine what is in the child's best interests. I would also urge the legislature to act to rectify the unjust disparity created by today's decision, a disparity that will victimize children who have had nothing to do with their lot. Accordingly, I dissent.