Maureen V. RUBANO

v.

Concetta A. DiCENZO.

No. 97–604–A.

Supreme Court of Rhode Island.

Sept. 25, 2000.

while living together as domestic partners in the same household. Thereafter the women separated but the biological mother agreed to allow the nonbiological parent to have informal visits with the child. Under these circumstances, does the Family Court have jurisdiction over a petition brought to determine the existence of a mother and child relationship between the nonbiological parent and the child? If so, can the Family Court enforce the domestic partners' written agreement (embodied in a consent order previously entered by the court) to allow the nonbiological parent to have visitation with the child after the parents have separated? These are questions of first impression in Rhode Island. For the reasons related below, we answer both of them in the affirmative.

### Facts/Travel

In 1988, plaintiff Maureen V. Rubano (Rubano) and defendant Concetta A. Di-Cenzo (DiCenzo) entered into what they characterize as a "committed relationship." Eventually they set up house together as domestic partners in Massachusetts. Three years later, still "more at love than law,"[1] they decided to have and raise a child. Accordingly, they arranged for Di-Cenzo to conceive via artificial insemination by an anonymous donor. In 1992, DiCenzo gave birth to a son. Thereafter, acting together with Rubano, she caused his last name to be listed on the birth and baptismal certificates as Rubano–DiCenzo and sent out printed birth announcements identifying both of them as the child's parents. Although Rubano never adopted the child, for four years she lived together with DiCenzo and both of them raised the boy as their son. In 1996, however, the couple separated. Taking the boy with her, DiCenzo moved to Rhode Island.

 Initially the parties set up an informal visitation schedule for Rubano to see the child. But in 1997 the schedule collapsed in the face of DiCenzo's resistance.

Cynthia M. Gifford, Cherrie R. Perkins, Providence, for plaintiff.

Rosina L. Hunt, Woonsocket, Maureen Slack DiCristofaro, Richard S. Cardozo, Cumberland, Donna M. Nesselbush, Providence, Mary L. Bonauto, Boston, MA, for defendant.

Present: WEISBERGER, C.J. LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

### OPINION

FLANDERS, Justice.

Two women agreed to become the parents of a child. They arranged for one of them to conceive via artificial insemination by an anonymous donor. Following the child's birth, they raised him for four years

---

1. Gordon, Lord Byron, *Don Juan,* Canto I. st. 58.

Consequently, Rubano filed a miscellaneous petition in Family Court seeking to establish her de facto parental status and to obtain court-ordered visitation with the child. After Rubano filed the lawsuit, the court appointed a guardian ad litem for the boy. In due course, the guardian submitted her recommendations to the court and the parties negotiated a compromise that they embodied in a consent order (order). The order stipulated that Rubano was to have "permanent visitation with [the child]" on a periodic basis, in exchange for which she agreed to waive "any claim or cause of action she has or may have to recognition as a parent of the minor child ***." After reviewing and approving its terms, including the parties' recitation that the visitation provisions of the order were "in the best interests of the minor child," the Chief Judge of the Family Court entered this agreement as an order of that court.[2]

DiCenzo, however, allegedly reneged yet again on the visitation agreement by

2. The concurring and dissenting opinion (hereinafter, the dissent) asserts that we erroneously refer to the order as having been entered by a Family Court justice following "a 'determination made by the justice that Rubano's visitation rights' with DiCenzo's biological child were 'in the best interests of the minor child.'" The dissent suggests that "[n]o such determination ever was made by the trial justice," only by the parties themselves in their "private agreement." But that conclusion ignores the fact that the court consciously and deliberately entered that order and thereby, ipso facto, caused the terms of that agreement to become an order of the court and not just a "private agreement." The cases that the dissent cites to contradict this assertion are all wide of the mark. Certainly *Attilli v. Attilli*, 722 A.2d 268 (R.I.1999); *Riffenburg v. Riffenburg*, 585 A.2d 627 (R.I. 1991); *O'Connell v. O'Connell*, 100 R.I. 444, 216 A.2d 884 (1966), all support the proposition that a mere private agreement between two consenting adults cannot of itself confer jurisdiction upon the Family Court to modify or enforce the alleged agreement. *See, e.g., Riffenburg*, 585 A.2d at 630 (holding that Family Court lacks authority to modify a separation agreement that was incorporated by reference but not merged into a final divorce judgment). But here the written agreement was not itself the basis for Family Court jurisdiction. And the parties' written agreement became an order of the Family Court. Thus, it was no longer a mere private agreement. Moreover, the fact that the Family Court never "participated in the discussion between the parties regarding their scheduling of visitation rights" is immaterial. Once the court entered the order, it became an order of the court and a finding of that court. *See State v. Lush*, 170 Neb. 376, 103 N.W.2d 136, 138 (1960) (noting that "[a] consent decree is as much a final decree and as conclusive upon the parties as is a decree which has been rendered after a hearing on the merits") (citing treatises); *see also Dean v. Dean*, 136 Or. 694, 300 P. 1027, 1028 (1931) (noting that "[a] consent decree is as much a final decree and as conclusive upon the parties as a final decree rendered after a trial on the merits"). Nonetheless, the dissent argues that the court entered the order "after only an exiguous reading of [the consent order's] contents." We do not believe that the record supports this conclusion, because we do not interpret the remarks of the Family Court's Chief Judge to suggest that he did not read the order carefully before entering it. On the contrary, we presume that he did and nothing in the record suggests otherwise. But whether the court read the order carefully or "exiguously" is of no consequence; what matters is that the court intended to and did in fact enter that order. Thus, its efficacy as a legal mandate cannot be undermined by how "exiguously" or not the trial justice read the order. Certainly, the Chief Judge of the Family Court did not enter this order by mistake; and the mere fact that its language originated from the parties is hardly a novel phenomenon. Many, if not most orders that are entered by courts in this jurisdiction and throughout the country are drafted by one or more of the parties and then presented to the court for entry. Heretofore, we have not determined the efficacy of court orders based upon how "exiguously" a trial justice has reviewed the language therein before entering the order. Such a rule, were it to be adopted, would create an instant "get-out-of-jail-free card" for anyone who had second thoughts about complying with the terms of the court's order. Put another way, the legal effect of a court order does not turn on how "carefully read" the proposed order was by the particular justice who entered the order. Absent a mistake or some other reason that would justify vacating the order, a court order is still a valid and enforceable mandate of the court, regardless of who drafted the language of the order and how carefully the court read the order before entering it.

thwarting Rubano's attempted visits with the child. DiCenzo, who by now had entered into a new relationship, contended that Rubano's visits had become psychologically harmful to the child. Charging once more into the breach, Rubano sought contempt relief from the Family Court and asked it to enforce the order. This time, however, DiCenzo was not as agreeable as when the parties had first formulated the order: she now argued that the Family Court lacked jurisdiction to enter the order in the first place, much less to enforce it. Rubano countered that the Legislature had bestowed jurisdiction upon the Family Court to resolve matters like this and that the court therefore should enforce its own order and Rubano's visitation agreement with DiCenzo. Expressing doubts about how these issues should be resolved, the Family Court certified to this Court the three questions set forth below.[3] After reviewing the parties' legal briefs and that of the amici,[4] and after considering their oral arguments, we respond to these questions as follows.

### Question I

"Does a child, biological mother, and same sex partner, who have been involved in a committed relationship constitute a 'family relationship' within the meaning of G.L. § 8–10–3, such that the Family Court has jurisdiction to entertain a miscellaneous petition for visitation by the former same sex partner when the same sex partner is no longer engaged in the committed relationship?"

■■■ The Family Court has asked us to rule on whether it has the power to adjudicate Rubano's petition to determine her de facto parental status and to enforce the parties' visitation agreement under the Family Court's G.L.1956 § 8–10–3(a) jurisdiction to hear "equitable matters arising out of the family relationship." We begin our analysis by examining the above-referenced statutory language of § 8–10–3 to ascertain whether its provisions are clear and unambiguous, *see State v. Alejo*, 723 A.2d 762, 764 (R.I.1999) (per curiam); if so, "the statute may not be construed or extended but must be applied literally." *Pizza Hut of America, Inc. v. Pastore*, 519 A.2d 592, 593 (R.I.1987) (quoting *Citizens for Preservation of Waterman Lake v. Davis*, 420 A.2d 53, 57 (R.I.1980)). "[T]he Family Court, as a court of statutory origin, has no more powers than those expressly conferred upon it by the Legislature." *Waldeck v. Piner*, 488 A.2d 1218, 1220 (R.I.1985). Thus, it is powerless to act when the subject matter of a dispute is not within its statutory grant of jurisdiction. *See Rogers v. Rogers*, 98 R.I. 263, 267–68, 201 A.2d 140, 143 (1964).

Section 8–10–3, entitled "Establishment of court—Jurisdiction ***," provides in pertinent part, as follows: "(a) There is

---

3. We interpret G.L.1956 § 8–10–43 (vesting Family Court justices with the same prerogatives and authority as Superior Court justices) in conjunction with the certification provisions of G.L.1956 § 9–24–27, thereby allowing Family Court justices to certify questions to this Court. Thus, even though § 9–24–27 authorizes only Superior Court justices and District Court judges to certify questions, this Court previously has ruled that § 8–10–43 allows Family Court justices to certify questions "at least when exercising juvenile court jurisdiction." *In re Correia*, 104 R.I. 251, 254 n. 2, 243 A.2d 759, 760 n. 2 (1968). We now construe § 8–10–43 to authorize Family Court justices, like their Superior and District Court counterparts, to certify questions to this Court "of such doubt and importance and [that] so affect[ ] the merits of the controversy that [they] ought to be determined by the supreme court before further proceedings ***." Section 9–24–27.

4. The amici include the following organizations that joined in a single brief in support of Rubano's position: Gay and Lesbian Advocates and Defenders, The National Association of Social Workers, Rhode Island Chapter, Jewish Family Service, Children's Friend and Service, Rhode Island State Council of Churches, Rhode Island Alliance for Lesbian and Gay Civil Rights, Ocean State Action, Rhode Island Affiliate, American Civil Liberties Union, Youth Pride, Inc., Rhode Island Coalition Against Domestic Violence, and the YWCA of Northern Rhode Island.

hereby established a family court *** to hear and determine *** equitable matters arising out of the family relationship, *wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance ***.*" (Emphasis added.)

Asserting that the above-referenced "family relationship" language in § 8–10–3 does not cover the situation presented by the case at bar, DiCenzo urges us to answer question number one in the negative. Rubano, on the other hand, posits a "liberal" interpretation of the "equitable matters arising out of the family relationship" jurisdiction of § 8–10–3, one that would encompass a sufficiently broad authority for the Family Court to take cognizance

5. Section 8–10–2 provides as follows:

> "**Purpose of chapter.**—This chapter shall be liberally construed to the end that families whose unity or well-being is threatened shall be assisted and protected, and restored, if possible, as secure units of law-abiding members; that each child coming within the jurisdiction of the family court shall receive the care, guidance and control which will conduce to his or her welfare and the best interests of the state; and that when a child is removed from the control of his or her parents, the family court shall secure for him or her care as nearly as possible equivalent to that which his or her parents should have given him or her."

6. Section 8–10–3 provides in pertinent part as follows:

> "**Establishment of court—Jurisdiction— Seal —Oaths—Masters.**—(a) There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for divorce from the bond of marriage and from bed and board; all motions for allowance, alimony, support and custody of children, allowance of counsel and witness fees, and other matters arising out of petitions and motions relative to real and personal property in aid thereof, including, but not limited to, partitions, accountings, receiverships, sequestration of assets, resulting and constructive trust, impressions of trust, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance;

over disputes like this one. Section 8–10–2,[5] she argues, buttresses her position because it mandates a "liberal" construction of the Family Court's jurisdictional grant of authority in order to realize the purposes of the law establishing the Family Court. Rubano reasons that the language of § 8–10–2 reveals a legislative intent to paint the Family Court's powers with a broad jurisdictional brush so it can protect the best interests of children who need its oversight. This intent, she suggests, calls for an expansive reading of this portion of the Family Court's jurisdictional statute to include the "family relationship" before us.

Upon reviewing the statutory language at issue, however, it is immediately apparent to us that this portion of § 8–10–3 [6]

> all motions for allowance for support and educational costs of children attending high school at the time of their eighteenth (18th) birthday and up to ninety (90) days after high school graduation, but in no case beyond their nineteenth (19th) birthday; enforcement of any order or decree granting alimony and/or child support, and/or custody and/or visitation of any court of competent jurisdiction of another state; modification of any order or decree granting alimony and/or custody and/or visitation of any court of competent jurisdiction of another state on the ground that there has been a change of circumstances; modification of any order or decree granting child support of any court of competent jurisdiction of another state provided: (1) the order has been registered in Rhode Island for the purposes of modification pursuant to § 15–23.1–611, or (2) Rhode Island issued the order and has continuing exclusive jurisdiction over the parties; antenuptial agreements, property settlement agreements and all other contracts between persons, who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship; complaints for support of parents and children; those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the department for children, youth, and families pursuant to the provisions of chapter 1

does not grant jurisdiction to the Family Court in all "equitable matters arising out of the family relationship," but only in those equitable matters "wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance." This final limiting clause narrows the class of "equitable matters arising out of the family relationship" that the Family Court may hear under this portion of § 8–10–3(a) to only cases that originate in petitions for divorce, bed and board, and separate maintenance. Because neither Rubano nor DiCenzo ever has filed any such petition, neither Rubano's original petition to determine her parental status and to enforce the parties' visitation agreement nor her later efforts to uphold the parties' consent order fall within the limited "family relationship" jurisdictional provisions of § 8–10–3.

■ Accordingly, to answer question one, we need not determine whether the parties' involvement with each other and with the child constituted a "family relationship" within the meaning of this term as it is used in this portion of § 8–10–3(a).

The statutory language that the Legislature used to vest the Family Court with equity jurisdiction in this subsection of § 8–10–3 is, by its terms, limited to situations in which the court's equitable jurisdiction is invoked by a petition for divorce, bed and board, or separate maintenance. Thus, we conclude, the Legislature did not intend for the Family Court to acquire jurisdiction over this type of controversy under the restricted "equitable matters arising out of the family relationship" jurisdictional provisions of § 8–10–3(a). Nevertheless, for the reasons discussed below, this does not mean that the Family Court lacks jurisdiction to adjudicate this dispute under some other provision of § 8–10–3 or under another statute.

### Question II

**"If the answer to the above question is in the negative, does such a conclusion violate Article I, section 5 of the Rhode Island Constitution?"**

Article 1, section 5, of the Rhode Island Constitution provides, in pertinent part, as follows:

of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those matters referred to the court in accordance with the provisions of § 14–1–28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; responsibility for or contributing to the delinquency, waywardness, or neglect of children under sixteen (16) years of age; desertion, abandonment, or failure to provide subsistence for any children dependent upon such adults for support; neglect to send any child to school as required by law; bastardy proceedings and custody to children in proceedings, whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings; and appeals of administrative decisions concerning setoff of income tax refunds for past due child support in accordance with §§ 44–30.1–5 and 40–6–21. The holding of real estate as tenants by the entirety shall

not in and of itself preclude the family court from partitioning real estate so held for a period of six (6) months after the entry of final decree of divorce.

\*\*\*

"(e) The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years and appeals of administrative decisions concerning setoff of income tax refunds, lottery set offs, insurance intercept, and lien enforcement provisions for past due child support, in accordance with §§ 44–30.1–5 and 40–6–21, and appeals of administrative agency orders of the department of human services to withhold income under chapter 16 of title 15.

"(f) The family court shall have jurisdiction over those civil matters relating to the enforcement of laws regulating child care providers and child placing agencies.

"(g) The family court shall have exclusive jurisdiction of matters relating to the revocation or nonrenewal of a license of an obligor due to noncompliance with a court order of support, in accordance with chapter 11.1 of title 15."

"Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character."

Initially, Rubano argued that she had been injured and wronged by DiCenzo's refusal to acknowledge her parental status vis-à-vis the child and to abide by the parties' visitation agreement.[7] After the parties entered into the Family Court's consent order, Rubano asserted that DiCenzo violated its terms and that she was entitled to seek enforcement thereof. If Rubano has a remedy for this alleged injury or wrong by having recourse to the laws of this state, then no violation of article 1, section 5 exists. *See, e.g., In the Matter of Nichols,* 8 R.I. 50, 54 (1864) ("[a]lthough, in a free government, every [person] is entitled to an adequate legal remedy for every injury done to him [or her], yet the form and extent of it is necessarily subject to the legislative power ***"). We are of the opinion that Rubano has such a remedy.

General Laws 1956 § 15–8–26 entitled Rubano to bring an action to have the Family Court determine "the existence or nonexistence of a mother and child relationship" between herself and the child because she was, by virtue of her supposed visitation agreement with DiCenzo and her alleged de facto parental relationship with the child, an "interested party" within the meaning of that term as it is used in § 15–8–26 ("[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship"). In addition, Rubano was entitled to seek a remedy for DiCenzo's alleged violation of the parties' visitation agreement under the portion of § 8–10–3(a) that grants jurisdiction to the Family Court to hear "those matters relating to adults who shall be involved with paternity of children

born out of wedlock." Alternatively, the Superior Court would also have concurrent equitable jurisdiction to enforce the visitation agreement. Thus, our response to question No. II is that answering question No. I in the negative does not violate article 1, section 5, of the Rhode Island Constitution because Rubano has certain remedies, having recourse to the laws of this state for all injuries or wrongs which she allegedly has suffered by reason of DiCenzo's conduct in this matter. We amplify our response by addressing below each one of these available remedies.

A. *Jurisdiction under § 15–8–26*

■ The Family Court has jurisdiction to determine the existence or nonexistence of a mother and child relationship between Rubano and the child under § 15–8–26 of Rhode Island's hybrid version of the Uniform Act on Paternity, 9B U.L.A. 347–68 (1987), that the Legislature adopted in 1979 and named the "Uniform Law on Paternity (ULP)." *See* P.L.1979, ch. 185, § 2. Indeed, Rubano's original petition— the one that resulted in the order—asked the Family Court to determine her de facto parental relationship with the child and to "establish a fair and reasonable visitation schedule between [Rubano and the child]."

Section 15–8–26 of the ULP provides as follows:

**"Action to declare mother and child relationship.**—Any interested party may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable, the provisions of this chapter applicable to the father and child relationship shall apply."

Under this section, Rubano was an "interested party" because she claimed that she

---

7. Unlike the dissent, we do not view the parties' visitation agreement as "one that is in the nature of a private property settlement agreement." A person's agreement to allow or to obtain visitation with a child is not in the nature of a private property agreement because a child is not property, nor is the right to visit with a child in the nature of an interest in property.

had a de facto mother and child relationship with the child and because she claimed that the child's biological mother had agreed to allow her reasonable visitation with the child. Whether her claims had any merit was a factual matter for the Family Court to decide, but the plain language of this provision of the ULP vests the Family Court with jurisdiction to declare the existence *vel non* of a mother and child relationship in these limited circumstances.[8] Thus, in contrast to the situation in the United States Supreme Court's recent decision of *Troxel v. Granville*, ___ U.S. ___, ___, 120 S.Ct. 2054, 2057, 147 L.Ed.2d 49, 53 (2000), in which the Court invalidated a state statute allowing "any person" to petition for visitation rights "at any time," here we construe § 15–8–26's "[a]ny interested party" language much more narrowly, requiring an alleged parent-like relationship with the child before a party who is neither the child's biological parent nor a legal representative of the child can seek relief under § 15–8–26. Rubano's alleged close involvement with the child's conception and upbringing for as long as she and DiCenzo cohabited (approximately four years) and her alleged visitation agreement with DiCenzo when the couple separated endowed her with the requisite parent-like relationship and standing to obtain a judicial determination under this section. Indeed, if the parties had chosen to litigate this issue rather than to settle their dispute and if the facts were contrary to what Rubano had alleged, the ULP expressly allowed for a finding that no mother and child relationship existed between Rubano and the child; but, in any event, there is no question but that § 15–8–26 gives the Family Court jurisdic-

tion to determine whether such a relationship exists in cases like this one.

Nevertheless, the dissent suggests that both the order and the parties' settlement agreement (they became one and the same) "specifically negate any such right on Rubano's party to a claim of parentage adjudicated in court." However, both the order and the parties' settlement agreement were conditioned on the provision allowing Rubano to have visitation with the child. Thus, it hardly negates any such right on Rubano's part to have her parental-rights claim adjudicated; rather, it was simply a part of the court's order and the parties' settlement agreement that she was giving up her right to claim parentage vis-à-vis the child in exchange for court-ordered visitation with him. Without court-ordered visitation, the waiver of Rubano's claims to parental rights would have no effect whatsoever.

■ Most significantly, § 15–8–26 does not require that the interested party who is seeking such a Family Court determination allege that he or she is the biological parent of the child. Rather, the Family Court, as in *Pettinato v. Pettinato*, 582 A.2d 909 (R.I.1990), has the power to determine the existence of a de facto parent-child relationship despite the absence of any biological relationship between the putative parent and the child. In *Pettinato*, the Family Court had awarded a nonbiological parent custodial rights vis-à-vis a minor child based upon his status as a de facto parent to that child, despite the biological mother's objections to the granting of such rights and notwithstanding her assertion that this putative parent was not

---

**8.** The dissent espouses several rather extravagant assertions about what the majority of the Court supposedly has determined in this case. Without responding to each of these assertions, we would simply caution the reader that our silence does not imply our acquiescence or agreement. Thus, for example, we deny that we have modified the General Assembly's definition of paternity, judicially legislated an amendment to § 8–10–3, or recognized "that a man can become pregnant after

intercourse with a woman and then require the woman to pay for his hospital and delivery expenses." These and other like assertions about this opinion are baseless. For example, the dissent's assertion that "all roads from [G.L.1956] § 15–8–1 lead directly to the *'father'* of any child born in, or out of wedlock" overlooks the maternal-relationship superhighway running down the middle of § 15–8–26.

even biologically related to the child. *Id.* at 910–11. We affirmed and held that the biological mother was equitably estopped from preventing a de facto father from seeking or obtaining custody of a child born out of wedlock to the mother when both parents had lived with, raised, and held out the child to the community as their child. *Id.* at 913.

The dissent argues that "[t]he *Pettinato* Court's use of equitable estoppel as a shield to prevent [the biological mother] from attacking the presumption of paternity created by § 15–8–3, was for a totally different purpose than that for which the majority now attempts to employ equitable estoppel against DiCenzo; namely, to create jurisdiction in the Family Court over Rubano's complaint seeking visitation rights to a minor child against the wishes of DiCenzo, the child's biological mother." We agree with the dissent that, generally speaking, the estoppel doctrine acts as a legal shield rather than a sword, and, therefore, it does not "of itself create new rights." Our holding here, however, does not run afoul of this principle. Like the nonbiological parent's right to custody in *Pettinato*, Rubano's right to seek court-ordered visitation with the child stemmed from her alleged de facto parental relationship with him and from her visitation agreement with DiCenzo, but not from the use of estoppel. The estoppel doctrine merely bars DiCenzo from asserting that Rubano's lack of a biological tie to the child is fatal to Rubano's claim for legal recognition of her rights as a de facto parent; but it does not serve to *create* a right that does not otherwise exist by reason of Rubano's alleged parental relationship with the child and her asserted visitation agreement with DiCenzo as embodied in the order. On the contrary, it merely serves to allow the court to recognize a nonbiological parent's right to court-ordered visitation with a child based upon, in part, the existence of these circumstances.

Thus, if the Family Court were able to find that Rubano's alleged de facto parental relationship with the child, her asserted visitation agreement with DiCenzo, and the claimed need to prevent any harm to the child's best interests not only existed in this case but constituted clear and convincing evidence sufficient to overcome the otherwise applicable presumption in favor of honoring a fit custodial parent's determination not to allow such visitation, *see Troxel,* —— U.S. at ——, 120 S.Ct. at 2062, 147 L.Ed.2d at 60 ("the [state] court must accord at least some special weight to the [biological] parent's own determination"), then it could award visitation to Rubano under the ULP.

The dissent also refers to the Wisconsin case of *In re Z.J.H.,* 162 Wis.2d 1002, 471 N.W.2d 202, 212 (1991), in support of its position that "[t]he legal effects and consequences of statutory limitations cannot be avoided by estoppel." But, apart from the fact that the Wisconsin Supreme Court has overruled this case,[9] we do not use estoppel to avoid any statutory limitations. In *Z.J.H.,* the Wisconsin Supreme Court found that because a former same-sex parent was barred by statute from claiming visitation or custody rights, she could not use estoppel to circumvent the law and pursue her claim in the face of a statute that precluded her standing. *See id.* at 211–12. Here, on the contrary, we have determined that a statutory basis does exist for Rubano's visitation claim under the ULP and that no other statute bars her from seeking such rights. Thus, we merely employ estoppel to prevent DiCenzo from challenging the alleged mother-child relationship between Rubano and the child based upon Rubano's lack of a biological tie to the child.

9. *See In re H.S.H–K.,* 193 Wis.2d 649, 533 N.W.2d 419, 434 (1995). There, the Wisconsin Supreme Court explicitly overruled *Z.J.H.* and concluded that "public policy considerations *do not prohibit* a court from relying on its equitable powers to grant visitation apart from [a statute] on the basis of a co-parenting agreement between a biological parent and another when visitation is in the child's best interest." (Emphasis added.)

Nor do we invoke equitable estoppel "to create jurisdiction in the Family Court" over Rubano's claims, as the dissent alleges. On the contrary, we apply the doctrine of equitable estoppel to the liability and remedial aspects of Rubano's claims vis-à-vis DiCenzo, but not to her claimed entitlement to be heard in Family Court. For jurisdiction, we rely upon the plain language of § 15–8–26 and upon Rubano's alleged status as a de facto parent to the child and as a party to an asserted visitation agreement with DiCenzo. Nor are we using estoppel to avoid the statutory restrictions placed upon the Family Court's special and limited jurisdiction. The only jurisdictional restriction § 15–8–26 imposes is that an "interested party" must bring the claim. Rubano qualified as an interested party because of her alleged parental bond with the child, one that she asserted was formed over a multiyear period during which a parent-child relationship developed between the child and herself, and because of her domestic partnership, co-parenting, and visitation agreement with DiCenzo, but not because of any estoppel barring DiCenzo from contesting her alleged parental rights.

Moreover, the holding in *Pettinato* bears directly on the facts at issue here. In *Pettinato,* the child's biological mother attempted to use a de facto parent's lack of biological connection with the child to defeat a custody award to that parent. Even though, as the dissent notes, the Family Court in *Pettinato* acquired jurisdiction through the filing of a petition for divorce, its holding—that a nonbiological parent may be awarded custody over the objection of a biological parent—supports our conclusion here that such a nonbiological parent is eligible under § 15–8–26 to bring an action to declare the existence *vel non* of a mother-child relationship. Thus, the fact that the Family Court in *Pettinato* acquired jurisdiction through the filing of a divorce petition, rather than under § 15–8–26, is irrelevant to whether Rubano qualifies as an "interested party" under § 15–8–26. *Pettinato* simply supports the proposition that an "interested party" under § 15–8–26 may include a person who, though he or she has no biological connection with a child, nonetheless has functioned as a parent in relation to that child and has been held out to the community as the child's parent by the biological parent. Notably, in other sections of the ULP, the Legislature demonstrated that it knew how to adopt appropriate limiting language when it wished to exclude nonbiological parents from its provisions. *See, e.g.,* § 15–8–3(a) ("[a] man is presumed to be the *natural* father of a child if \*\*\*"). (Emphasis added.). But in § 15–8–26, it chose not to include such limiting language, thereby allowing a nonbiological parent to establish the existence of a de facto mother-child relationship with the child in question.

Though the dissent contends that § 15–8–26 "was obviously enacted to provide for those infrequent occasions when \*\*\* a young child who may be living with a single father, or in a foster home, may have need, or want, to have his or her maternal relationship determined," and that it does not permit someone who already knows who a child's biological mother is to "intrude upon an already established biological mother and child relationship," we do not discern any such limiting language in the "[a]ny interested party" language of § 15–8–26. Moreover, if the General Assembly had intended to permit only a biological mother or a child living with a single father or in a foster home to bring an action to determine the existence of a mother and child relationship, we are of the opinion that it would have said so instead of using the broader term "[a]ny interested party." A biological connection with either the mother or the child is but one potential source of an interest sufficient to confer standing on a person seeking to obtain a judicial determination concerning the existence of a mother-child relationship. Thus, contrary to the dissent's position, the language of § 15–8–26 does not specifically limit its

scope to those interested in determining a *biological* mother-and-child relationship. As we noted above, the Legislature knew how to restrict specific ULP provisions to a biological relationship when it wished to do so. Thus, the assumption underlying the dissent's reading of § 15–8–26—that it refers *only* to actions seeking to determine a biological mother and child relationship—is unsupported by the language of the statute.

The dissent also suggests that our conclusion "that jurisdiction exists in the Family Court over Rubano's novel complaint filed pursuant to § 15–8–26 of the U.L.P. [Uniform Paternity Act], misinterprets *** the nature of the U.L.P. [Uniform Paternity Act]."[10] However, Rhode Island's "Uniform Law on Paternity" (that is, chapter 8 of title 15), is a combination of selected provisions from both the Uniform Act on Paternity, 9B U.L.A. 347–68 (1987), and from the Uniform Parentage Act, 9B U.L.A. 334–45 (1987). It also included sections that are unique to Rhode Island. Indeed, of the twenty-eight sections found in chapter 8 of title 15, the General Assembly adopted six, in whole or in part, from the Uniform Act on Paternity.[11] It included ten others, in whole or in part, from the Uniform Parentage Act.[12] The remaining sections adopted by the General Assembly are unique to our state.

Second, the dissent's reliance on *Waldeck v. Piner*, 488 A.2d 1218 (R.I.1985), for the proposition that the "unequivocal aim" of our state's ULP was to provide a mechanism for enforcement of child-support responsibilities is not persuasive. The Court's discussion in *Waldeck* about the purpose of the ULP was in specific reference to § 15–8–2, the ULP's enforcement provision. The General Assembly adopted this provision from the Uniform Act on Paternity § 2, and later amended that provision to include the "father" as one of the interested parties who could seek enforcement of paternity. *See* P.L.1995, ch. 320, § 1. (The Uniform Act on Paternity does not include the father as an eligible complainant.) But that provision is not in issue here; rather, the General Assembly adopted § 15–8–26 directly from the Uniform Parentage Act § 21. Thus, the dissent's misplaced reliance on *Waldeck* actually supports our position because, as that case noted, "the Uniform Parentage Act *** establishes parental rights ***." *Waldeck*, 488 A.2d at 1221. (Emphasis added.)

### B. *Jurisdiction under § 8–10–3*

■ We also hold that Rubano was entitled to seek a remedy for DiCenzo's alleged refusal to provide her visitation with the child under the portion of § 8–10–3 that grants jurisdiction to the Family Court over "those matters relating to adults who shall be involved with paternity of children born out of wedlock."[13] *See*

---

**10.** In *Waldeck v. Piner*, 488 A.2d 1218, 1219 (R.I.1985), this Court referred to chapter 8 of title 15 as the "Uniform Paternity Act." In fact, the popular name that the General Assembly gave to this chapter was the "Uniform Law on Paternity." *See* P.L.1979, ch. 185, § 2. Moreover, the term "Uniform" in our "Uniform Law on Paternity" is somewhat of a misnomer. Unlike other states, Rhode Island has adopted a substantial number of sections from *both* the Uniform Act on Paternity as well as the Uniform Parentage Act in order to create a statute that covers aspects of both these uniform laws.

**11.** The General Assembly adopted G.L.1956 §§ 15–8–1, 15–8–2, 15–8–4, 15–8–5, 15–8–10, and 15–8–21, in whole or in part, from the

Uniform Act on Paternity, §§ 1, 2, 3, 4, 6, and 13 respectively. 9B U.L.A. 347–68 (1987).

**12.** The General Assembly adopted §§ 15–8–3, 15–8–7, 15–8–9, 15–8–15, 15–8–16, 15–8–17, 15–8–18, 15–8–19, 15–8–23, and the provision in question, 15–8–26, from the Uniform Parentage Act, §§ 4, 8, 8(c), 12, 14, 20, 15, 17, 23, and 21, respectively. 9B U.L.A. 334–45 (1987).

**13.** While the word "paternity" implies the "fathering" of a child, we are mindful of the Legislature's instruction that when statutes are construed "[e]very word importing the masculine gender only, may be construed to extend to and to include females as well as males." G.L.1956 § 43–3–3. Thus, two

§ 8–10–3(a). *Cf. Pettinato,* 582 A.2d at 912–13 (awarding custody of a minor child born out of wedlock to the biological mother's estranged husband on the basis of the child's best interests despite the fact that the husband was not the child's biological father). Because Rubano and DiCenzo were never married, the child was born out of wedlock. Allegedly, Rubano was "involved with" the child's paternity in that DiCenzo's artificial insemination occurred only pursuant to her "joint decision [with Rubano] to bear a child and to raise said child together." Moreover, Rubano not only allegedly helped to plan and arrange for DiCenzo's conception of the child via artificial insemination from an anonymous donor, she also averred that she was primarily responsible for the financial costs associated with this procedure. On his birth certificate, DiCenzo and Rubano caused the child's last name to be listed as "Rubano–DiCenzo" by compounding their surnames. Further, according to her petition, Rubano's name appeared on the child's baptismal certificate; DiCenzo and Rubano sent out printed birth announcements identifying both of them as the child's parents; and Rubano helped to raise and nurture the child for four years while living with DiCenzo and the child, thereby serving as one of the child's de facto parents (the child refers to Rubano as his "heart mom").

If the parties had chosen to litigate this matter to an adversarial conclusion instead of settling via the order, and if the factual allegations in Rubano's petition had been established, then Rubano would have been able to prove that she had been "involved with [the] paternity" of this child born out of wedlock within the meaning of this discrete jurisdictional provision of § 8–10–3. Thereafter, following *Pettinato*'s rationale, the Family Court could have determined that DiCenzo was equitably estopped from denying Rubano's status as a de facto parent, and that the child's best interests called for Rubano to have visitation with the child. *See Pettinato,* 582 A.2d at 913 (because the putative father's name was on the child's birth certificate and because the biological mother's conduct evinced an acceptance of the nonbiological parent as the father of the child, the biological mother was equitably estopped from objecting to the Family Court treating this individual as the child's father and awarding him custody of the child).

In sum, we hold that Rubano was entitled to pursue her Family Court action against DiCenzo to determine her de facto maternal status vis-à-vis the child, to settle that action via the order, and to obtain relief for an alleged contempt thereof by DiCenzo that would bar her from violating the visitation terms of this order. The basis for our ruling is that, in the words of § 8–10–3, both these parties are adults who were "involved with [the] paternity" of a child born out of wedlock. In such cases, the Family Court has jurisdiction under § 8–10–3 to resolve visitation disputes because they concern "matters relating to adults who shall be involved with the paternity of children born out of wedlock." [14]

women may certainly be "adults who shall be involved with paternity" of a child for purposes of this statute.

**14.** During oral argument, it was asserted that this grant of jurisdiction was intended only to permit the Family Court to provide financial support for children born out of wedlock by giving the Family Court jurisdiction over any adult involved with the paternity of such children. It is clear to us, however, that even though this language does give the Family Court authority to make and enforce support orders, it is not so limited by its terms. Thus, under this provision DiCenzo could petition the Family Court for an order requiring Rubano to provide support for the child. But nothing in the language of the statute indicates that the "matters" over which the Family Court has jurisdiction are limited to financial matters. Thus, in the absence of such a statutory limitation, we hold that the jurisdiction of the Family Court extends to matters such as visitation that are reasonably related to the parties' involvement with the paternity of a child born out of wedlock. Moreover, even a cursory review of the plain language of § 8–10–3 reveals multiple subsections that do not require that all matters brought under this statute relate to petitions for divorce or

In holding that § 15–8–26 and § 8–10–3's "adults who shall be involved with paternity" clause provide two separate bases of jurisdiction for Rubano's claims, we note that we have not, as the dissent would have it, "mix[ed] together portions from the broad statutory language found in § 8–10–3 *** with the general statutory wording found in § 15–8–26." On the contrary, as is clear from the above analysis, we conclude that these distinct jurisdictional grants provide two separate and independent jurisdictional bases for Rubano's claim. Thus, whatever "strange mix" the dissent envisions concerning these two provisions is a cocktail that it alone has shaken and stirred.

### C. *Superior Court Jurisdiction*

 Alternatively, Rubano was entitled to seek a remedy in Superior Court for DiCenzo's alleged violation of the visitation agreement. *See* G.L.1956 § 8–2–13 ("[t]he superior court shall, except as otherwise prohibited by law, have exclusive original jurisdiction of suits and proceedings of an equitable character *** "). Before the Legislature established the Family Court, the Superior Court had exercised equitable jurisdiction over suits involving child visitation and custody. *See, e.g., Hoxsie v. Potter,* 16 R.I. 374, 377, 17 A. 129, 130 (1888) (concerning an award of custody by the Superior Court

to a child's paternal aunt contrary to the biological mother's wishes). The Superior Court did not lose this jurisdiction after the General Assembly created the Family Court. Rather, the Family Court and the Superior Court maintain concurrent jurisdiction over such matters. *See Lubecki v. Ashcroft,* 557 A.2d 1208, 1211 (R.I.1989) (holding that a contract dispute between a former husband and wife could properly reside in the Superior Court). Thus, under its general equitable powers, the Superior Court also had the jurisdictional authority to hear plaintiff's case and to decide whether to enforce the parties' visitation agreement (as it was embodied in the Family Court's order) just as it would any other such agreement. However, because in this case proceedings were initiated in the Family Court and the parties' settlement in the form of an order has already entered in that court, the Superior Court, as a matter of comity, should abstain from asserting its jurisdiction if either party should attempt to invoke it.

### D. *Federal Constitutional Considerations*

 According to the United States Supreme Court, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions con-

---

separate maintenance, as the dissent contends. These subsections include, without limitation,

"those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability require special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the Department for Children, Youth and Families pursuant to the provisions of chapter 1 of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those

matters referred to the court in accordance with the provisions of § 14–1–28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; *** bastardy proceedings and custody to children in proceedings, *whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings ****.*" Section 8–10–3(a). (Emphasis added.) None of these above-specified subparts of § 8–10–3 requires that such proceedings thereunder be ancillary or incidental to petitions for divorce or separate maintenance filed in the Family Court. Accordingly, the dissent's attempt to limit § 8–10–3's jurisdiction just to "those claims that are ancillary or incidental to petitions for divorce or separate maintenance filed in that court" is contrary to what the statute provides.

cerning the care, custody, and control of their children." *Troxel,* —— U.S. at ——, 120 S.Ct. at 2060, 147 L.Ed.2d at 56 (striking down the State of Washington's nonparental visitation statute as applied to a child's paternal grandparents because of its unconstitutional overbreadth in allowing "any person" to petition for visitation rights "at any time" subject only to a best-interests-of-the-child standard). And we acknowledge, as did the *Troxel* Court, that "the State's recognition of an independent third party interest in a child can place a substantial burden on the traditional parent-child relationship." *Id.* at ——, 120 S.Ct. at 2059, 147 L.Ed.2d at 56. But in holding, as we do, that the Family Court had jurisdiction to determine the existence of a de facto parental relationship between Rubano and the child—a child with whom she has no biological relationship—and to enforce the biological mother's settlement agreement allowing Rubano to visit with the child, we also join with the high Court in recognizing that "persons outside the nuclear family are called upon with increasing frequency to assist in the everyday tasks of child rearing," *id.,* and that "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children *** as well as from the fact of blood relationship." *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 35 (1977) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 231–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15, 34–35 (1972)). And although "[t]he family unit accorded traditional respect in our society, which we have referred to as the 'unitary family,' is typified, of course, by the marital family, [it] also includes the household of unmarried parents and their children." *Michael H. v. Gerald D.,* 491 U.S. 110, 123 n. 3, 109 S.Ct. 2333, 2342 n. 3, 105 L.Ed.2d 91, 106 n. 3 (1989) (Scalia, J.,) (plurality opinion). We also acknowl-edge that "freedom of personal choice in matters of *** family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52, 60 (1974).

Although DiCenzo's constitutional liberty interest in exercising freedom of personal choice to prevent unwanted third parties from exercising parental rights with respect to her natural child would be entitled to special weight in any contested visitation case because "there is a presumption that fit parents act in the best interests of their children," *Troxel,* —— U.S. at ——, 120 S.Ct. at 2061, 147 L.Ed.2d at 58, her interest is not an unqualified one because the rights of a child's biological parent do not always outweigh those of other parties asserting parental rights, let alone do they trump the child's best interests. *See, e.g., Lehr v. Robertson,* 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (1983). In *Lehr,* the Court held that a biological father who had not cultivated a relationship with his child or contributed significantly to the child's support had no standing to object to an adoption proceeding that the child's mother and her new husband had initiated. *See id.* at 250, 103 S.Ct. at 2987, 77 L.Ed.2d at 619. The Court said that the biological father's mere genetic relationship to the child did not allow him to block a nonbiological parent's adoption of the child because of the "clear distinction between a mere biological relationship and an actual relationship of parental responsibility." *Id.* at 259–60, 103 S.Ct. at 2992, 77 L.Ed.2d at 625. Thus, a biological parent who has never shouldered any responsibility for the rearing of that parent's biological child does not have a constitutional right to veto the child's adoption by a nonbiological parent when that adoption is deemed to be in the child's best interest. *Id.* at 262, 103 S.Ct. at 2993–94, 77 L.Ed.2d at 627; *see also Quilloin v. Walcott,* 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54

L.Ed.2d 511, 520 (1978) (explaining that the biological parent "never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child" and thus his constitutional rights were of less weight than those of a married but nonbiological father who had "borne full responsibility for the rearing of his children during the period of the marriage").

Moreover, under certain circumstances, even the existence of a developed biological, parent-child relationship such as that between DiCenzo and this child will not prevent others from acquiring parental rights vis-à-vis the child. *See, e.g., Troxel,* — U.S. at —, 120 S.Ct. at 2061, 147 L.Ed.2d at 58 ("special factors *** might justify the State's interference with [the biological mother's] fundamental right to make decisions concerning the rearing of her [children]"); *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). In *Michael H.,* the Court held that a developed relationship within a family unit between a nonbiological parent and a child can, under certain circumstances, warrant more legal protection by a state than the equally developed relationship between the child and the biological parent outside the family unit because of "the historic respect—indeed, sanctity would not be too strong a term—traditionally accorded to the relationships that develop within the unitary family." *Id.* at 123, 109 S.Ct. at 2342, 105 L.Ed.2d at 106. Significantly, the *Michael H.* plurality opinion stated that "[t]he family unit accorded traditional respect *** is typified, of course, by the marital family, *but also includes the household of unmarried parents and their children.*" *Id.* at 123 n. 3, 109 S.Ct. at 2342 n. 3, 105 L.Ed.2d at 106 n. 3. (Emphasis added.) Indeed "[t]he demographic changes of the past century make it difficult to speak of an average American family." *Troxel,* — U.S. at —, 120 S.Ct. at 2059, 147 L.Ed.2d at 55.

Legal recognition of a de facto or "psychological parent" and child relationship—

notwithstanding the absence of any biological ties—also finds support in a recent decision of New Jersey's highest court. In *V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539 (2000), the New Jersey Supreme Court held that the same sex partner of a biological mother who had assumed a parental role in helping to raise the biological mother's child had established a "psychological parenthood" with respect to the child and thus had a legal right to petition for custody and visitation. *See id.* at 555.

The New Jersey Supreme Court applied a four-part test to determine whether a "psychological parenthood" existed between a "third party" adult and a child:

"the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged." *Id.* at 551.

While the first part of this test encompasses the estoppel element that we recognized in *Pettinato,* 582 A.2d at 913, the other three elements also provide useful criteria for evaluating whether a de facto parent-child relationship exists between an alleged psychological parent and a child. These criteria indicate that a given person's eligibility for "psychological parenthood" with respect to an unrelated child will be strictly limited to those adults who have served literally as one of the child's de facto parents. Thus, the New Jersey court's criteria preclude such potential third-party parents as mere neighbors, caretakers, baby sitters, nannies, au pairs, nonparental relatives, and family friends from satisfying these standards. Further, the court in *M.J.B.* explicitly stated that "a relationship based on payment by the legal parent to the third party will not qualify." *M.J.B.,* 748 A.2d at 552.

We also note that our position here is in harmony with the principles recently adopted by the American Law Institute (ALI) in its *Principles of the Law of Fam-*

*ily Dissolution: Analysis and Recommendations*, ch. 2, §§ 2.03–2.21 (Tentative Draft No. 4 of April 10, 2000 and adopted May 16, 2000). There, the ALI has recognized that individuals who have been significantly involved in caring for and supporting children and for whom they have acted as parents may obtain legal recognition of their parental rights to visitation and custody. *See id.* § 2.03. This category of child caregivers includes those who have held a reasonable good-faith belief that they were biological parents to the child, *see id.* § 2.03, Comment *(b )(ii )*, as well as those who, with the agreement of the legal parent, have regularly performed a substantial share of the child's caregiving. *See id.* § 2.03, Comment *(b )(iii )*. In sum, the effect of ALI's position is to recognize, as do we and the other authorities cited here, that, under certain limited circumstances, an unrelated caregiver can develop a parent-like relationship with the child that could be substantial enough to warrant legal recognition of certain parental rights and responsibilities vis-à-vis that child, especially when the court finds that, under the circumstances of a given case, "a parent has denied (or unreasonably denied) visitation to the concerned third party." *Troxel,* —— U.S. at ——, 120 S.Ct. at 2063, 147 L.Ed.2d at 60 (citing Rhode Island's G.L.1956 § 15–5–24.3(a)(2)(iii)–(iv) in the context of grandparent-grandchild visitation, as an example of a state law barring grandparents from visiting their grandchild unless a parent prevented them from doing so and "there is no other way the petitioner is able to visit his or her grandchild without court intervention").

■ Thus, we are not alone in acknowledging that "children have a strong interest in maintaining the ties that connect them to adults who love and provide for them," an interest that "lies in the emotional bonds that develop between family members as a result of shared daily life." *M.J.B.,* 748 A.2d at 550. Because of the importance of these bonds, we recognize that, consistent with the statutory law of domestic relations in this jurisdiction, a person who has no biological connection to a child but who has served as a psychological or de facto parent to that child may, under the limited circumstances outlined above, establish his or her entitlement to parental rights vis-à-vis the child. *See also In re Custody of H.S.H–K,* 193 Wis.2d 649, 533 N.W.2d 419 (1995) (allowing former female partner of biological mother to invoke equitable power of the court to obtain visitation if the biological parent has interfered substantially with the other person's established parent-like relationship with the child); *A.C. v. C.B.,* 113 N.M. 581, 829 P.2d 660 (App.1992) (holding that an agreement by a biological parent with an unrelated person for custody and visitation of a child is enforceable if it is in the child's best interest).

The dissent cites to the decision of an intermediate California appellate court in *West v. Superior Court (Lockrem),* 59 Cal. App.4th 302, 69 Cal.Rptr.2d 160, 162 (1997), as evidence that our reading of § 15–8–26 is in error. The *West* court held that "a person unrelated to [the child] is not an 'interested person' [under this portion of the Uniform Parentage Act]" and, therefore, could not bring an action under that act for visitation with a child she had cared for in a same-sex relationship with the child's mother. 69 Cal. Rptr.2d at 162. Although we disagree with the *West* court's ruling because it discounts the breadth of the "any interested person" language of § 15–8–26, we also note that that court was constrained by its own precedent in an earlier case to rule that a nonbiological parent in a same-sex bilateral relationship had no standing to obtain custody or visitation with respect to the child of his or her former domestic partner. *See* 69 Cal.Rptr.2d at 161 (citing *Curiale v. Reagan,* 222 Cal.App.3d 1597, 272 Cal.Rptr. 520 (1990)). In the years between that earlier case and the *West* decision, the court noted, "the Legislature *** has not seen fit to bestow jurisdiction *** under the circumstances presented here." *Id.* at 162. The *West* court also

observed that the nonbiological parent's estoppel argument, similar to Rubano's here, found no support in cases from that jurisdiction. *See id.* at 162–63. But unlike the *West* court, we have no earlier precedent in this jurisdiction declining to accord nonbiological parents any standing to seek legal recognition of their parental rights as de facto parents. Moreover, unlike the *West* court, we cannot infer any legislative intent to preclude standing to a de facto parent in Rubano's position because here the Legislature has not refused to amend § 15–8–26 in response to a court decision excluding nonbiological parents from its reach. Finally, the *West* court apparently did not have a decision similar to *Pettinato* to buttress the nonbiological parent's estoppel argument. Thus, we conclude, the *West* holding is not on point to the situation we face in this jurisdiction, and is contrary to the weight of authority elsewhere that has considered this issue.

■■■■ In sum, the mere fact of biological parenthood, even when coupled with the biological parent's ongoing care and nurture of the child and that parent's fundamental right "to make decisions concerning the care, custody, and control of [his or her] children," *Troxel,* —— U.S. at ——, 120 S.Ct. at 2060, 147 L.Ed.2d at 56, does not always endow the biological parent with the absolute right to prevent all third parties from ever acquiring any parental rights vis-à-vis the child. Thus, the fact that DiCenzo not only gave birth to this child but also nurtured him from infancy does not mean that she can arbitrarily terminate Rubano's de facto parental relationship with the boy, a relationship that DiCenzo agreed to and fostered for many years. Indeed, when DiCenzo agreed to give Rubano permanent visitation rights in the order, she admitted that she did so because, among other reasons, such visitation "is in the best interests of the minor child." Conversely, the fact that Rubano is not a biological parent does not necessarily relieve her of a potential legal obligation to support the child. *See Piet-*

*ros v. Pietros,* 638 A.2d 545, 548 (R.I.1994) (holding that a court may impose child-support obligations on a husband who is not a child's biological father). Hence, even if the order had not existed, Rubano would have been entitled to prove that she qualified as a de facto or "psychological" parent to the child and that she was, therefore, eligible for visitation rights and subject to child-support obligations.

■■■■ For these reasons, DiCenzo's constitutional rights as the child's natural mother to superintend his future upbringing and his associations with adults other than DiCenzo are not absolute. By her conduct in allowing Rubano to assume an equal role as one of the child's two parents, and by her conduct in agreeing to and signing an order that granted Rubano "permanent visitation" rights with the child because it "is in the best interests of the minor child" to do so, DiCenzo rendered her own parental rights with respect to this boy less exclusive and less exclusory then they otherwise would have been had she not by word and deed allowed Rubano to establish a parental bond with the child and then agreed to allow reasonable visitation. *Cf. Pettinato,* 582 A.2d at 913 (holding that a mother who, by her conduct, had acknowledged a person to be the child's parent, was equitably estopped from challenging "the status which he or she has previously accepted [or created]") (quoting *John M. v. Paula T.,* 524 Pa. 306, 571 A.2d 1380, 1386 (1990)). Under these circumstances, we do no violence to DiCenzo's constitutional rights when we hold that *Pettinato*'s estoppel doctrine precludes her from denying the existence of a "presumption [of parental rights] that she helped to bring about." 582 A.2d at 912.

### Question III

"If the answer to question 1 is in the affirmative, then does a non-biological partner, who has been a same sex partner with a biological mother have standing to petition the Rhode

Island Family Court for visitation pursuant to G.L. 15–5–1 et al. [*sic* ]?"

Because we have answered question no. I in the negative, we are not called upon to answer question no. III and we therefore decline to do so. In our response to question no. II, we held that concurrent jurisdiction in this type of case lies both in the Family Court and in the Superior Court. Based upon the allegations in Rubano's petition, we have concluded that she possessed the requisite interest and standing to file her petition asking the Family Court to determine her parental status and to enforce her visitation agreement. Accordingly, the Family Court has jurisdiction to enforce the order.

## Conclusion

For the reasons stated above, we answer question no. I in the negative. And because Rubano may obtain the relief she seeks, including enforcement of the order, both in the Family Court (under its jurisdictional provisions pertaining to matters involving maternity, paternity, and children born out of wedlock), and in the Superior Court (under its general equitable jurisdiction), we also answer question no. II in the negative. As a result, because we are not called upon to answer question no. III, we decline to do so. Finally, we note that DiCenzo's constitutional rights as a biological parent to prevent third parties from exercising parental rights vis-à-vis her child are not absolute when, as here, the best interests of the child are at stake and DiCenzo's conduct equitably estops her from objecting to Rubano's court-ordered visitation—especially after DiCenzo has agreed to Rubano's having "permanent" visitation with the child in an order that settled Rubano's petition to

obtain legal recognition of her de facto parental relationship with the child.

The papers in this case shall be remanded to the Family Court for further proceedings consistent with this opinion.

BOURCIER, Justice, with whom Chief Justice WEISBERGER joins, concurring and dissenting.

In this proceeding, three questions of law deemed by the Chief Judge of the Family Court to be of such doubt and importance as to affect the merits of a pending complaint in that Court have been certified to this Court pursuant to G.L. 1956 § 9–24–27. The plaintiff in that pending complaint is Maureen V. Rubano (Rubano), and the defendant therein is her former same-sex, live-in partner, Concetta A. DiCenzo (DiCenzo). In her complaint Rubano seeks to establish a de facto maternal relationship status with the biological and minor child of DiCenzo. I concur in part, and dissent in part with the responses to the three certified questions advanced by the majority. My dissent centers upon statutory and factual considerations presented by the record.

The majority opinion in this case will be noted not for what it says, but instead for what it does. In responding to the certified questions, the majority has:

1. modified and changed the universal and ages old definition of "paternity." That word now, according to the majority, merely *implies* the state of being a father;[15]

2. judicially legislated an amendment to G.L.1956 § 8–10–3 by expanding the Family Court's jurisdiction to include

15. The Random House Unabridged Dictionary 1421 (2d. ed.1987) defines paternity as: "*n.* 1. the state of being a father, fatherhood. 2. derivation or acquirement from a father. 3. origin or authorship.—*adj.* 4. noting or pertaining to a legal dispute in which an unwed mother accuses a man of being the father of

her child: a *paternity suit*." Random House Unabridged Dictionary 1421 (2d ed.1987). The dictionary definition of a paternity test is: "an assessment of possible paternity based on a comparison of the genetic markers of the offspring and those of the putative father." *Id.*

jurisdiction over matters *not* incidental to "petitions for divorce, bed and board and separate maintenance," as expressly required by that statute;

3. recognizes the right of unmarried same-sex partners to confer jurisdiction by estoppel on the Family Court to entertain miscellaneous petitions to adjudicate private agreements and/or disagreements between the unmarried persons;

4. construes and interprets the words mother and father in the Uniform Law on Paternity to be interchangeable, thus recognizing for the first time in this jurisdiction or in any other jurisdiction that a man can become pregnant after intercourse with a woman and then require the woman to pay for his hospital and delivery expenses;

5. recognizes private child visitation agreements between a biological parent and a third party same-sex partner to be assignable by that third party to other parties and, if not assigned, to be binding upon and inure to the third party's heirs and successors; and,

6. permits and recognizes that a minor child whose biological mother engages in same-sex unions may legally have as many mothers as the biological mother chooses to cohabitate with.

### Facts

In this proceeding, the plaintiff is Maureen V. Rubano (Rubano), a fifty-three-year-old resident and domiciliary of Massachusetts. She is an assistant professor of clinical psychiatry at the University of Massachusetts, as well as a director of psychological services and training at Westborough State Hospital in Massachusetts. Additionally, as a neuropsychologist, she treats patients for psychiatric problems at both institutions. The defendant in this proceeding is Concetta A. DiCenzo (DiCenzo), a Rhode Island resident.

Rubano and DiCenzo, both who resided in Massachusetts, decided in 1988 to become live-in partners, and took up residency together in Millville, Massachusetts. Three years later, as noted in the majority's opinion, DiCenzo, by means of artificial insemination by an anonymous donor, became pregnant, and on December 15, 1991, she gave birth to a boy. The child's birth certificate names DiCenzo as the mother. Understandably, the father is not identified.[16]

In 1993, Rubano hired Massachusetts counsel to draft a "parenting agreement" between her and DiCenzo with the intention of memorializing her rights relating to the young baby. DiCenzo, however, refused to execute the parenting agreement, which would have granted Rubano parental recognition or rights. DiCenzo additionally refused Rubano's later request to adopt her son.

Shortly thereafter, the live-in relationship cooled, and by early 1996, it had fizzled and frozen. DiCenzo left Rubano, left Massachusetts, and came with her then four-year-old son to live in Rhode Island. Subsequently, Rubano would come to Rhode Island to visit with DiCenzo's child. However, in February 1997, DiCenzo, believing that the visits were adversely affecting her son, told Rubano that she could no longer visit with him. One month later, Rubano came to Rhode Island and filed a miscellaneous petition in the Family Court. In that petition, Rubano sought to acquire a de facto parental relationship determination and status, and, as well, visitation rights with DiCenzo's minor child.

On May 19, 1997, the parties prepared and entered into a consent order that granted Rubano visitation rights with the child. The order specifically stated that "the parties entering into this Agreement do so out of concern for the emotional well-

---

**16.** DiCenzo asserts that she refused Rubano's request that her name appear on the birth

certificate as a second parent.

being of [the child] if exposed to trial." Subsequently, however, DiCenzo, believing that the visitations by Rubano were becoming disruptive and confusing for her son, found it necessary to place him in counseling. Later, on the advice and recommendation of the child's counselor, DiCenzo informed Rubano that no further visitations would be permitted and that suspension of visitation was in the child's best interest.[17]

## Question I

"Does a child, biological mother, and same sex partner, who have been involved in a committed relationship constitute a 'family relationship' within the meaning of G.L. § 8–10–3, such that the Family Court has jurisdiction to entertain a miscellaneous petition for visitation by the former same sex partner when the same sex partner is no longer engaged in the committed relationship?"

I concur with and join with my colleagues who opine in their response to certified question No. I that § 8–10–3 does not confer jurisdiction upon the Family Court over all equitable claims arising out of a family relationship, and confers jurisdiction only over those claims that are ancillary to, or incidental to, petitions for divorce or separate maintenance that are filed in that court. Because no such required petition ever has been filed in this proceeding, I agree with my colleagues that we need not undertake to determine whether the past interactions between the parties and the minor child suffice to constitute a "family relationship" within the meaning of § 8–10–3. I also concur in the majority's opinion that the General Assembly did not intend to vest equity jurisdiction in the Family Court over the manner

of relationship concerned in this proceeding when it enacted § 8–10–3.

## Question II

"If the answer to the above question is in the negative, does such a conclusion violate Article 1, section 5 of the Rhode Island Constitution?"

### (a)

### The Legal Considerations

With respect to certified question No. II, I part company with the response given to this question by my colleagues. They conclude that despite the absence of any filing of a petition for divorce or for separate maintenance by Rubano, nonetheless, the Family Court has been vested with jurisdiction by virtue of G.L.1956 § 15–8–26 of the Uniform Law on Paternity Act (ULP) to determine the existence or nonexistence of the alleged mother and child relationship between Rubano and DiCenzo's biological child. I read and construe our Act quite differently than do my colleagues.

The very first section in the ULP discloses what I believe to have been the General Assembly's clear intention for its enactment in 1979.[18] That intention was to establish and identify the *father* of a child born in or out of wedlock, including "a child born to a married woman by a *man* other than her lawful husband," § 15–8–1 (emphasis added), in order to impose upon him the financial obligations of the mother's pregnancy and confinement. In addition, the father would bear responsibility for the education, necessary support and maintenance, medical and funeral expenses of the child, as well as for any counsel fees

---

17. In a report to the Family Court, the child's counselor stated that she believed Rubano was using the child to manipulate DiCenzo and was sending unhealthy messages to him about his life with his mother. She also stated that the child indicated that he and Rubano "sleep in the same bed, either in his or hers, and that he is prompted to call her 'mother', and not tell [DiCenzo]." She concluded that visitation with Rubano was disruptive and confusing for him, and that his fear of hurting either woman's feelings was causing him to be frustrated.

18. General Laws 1956 § 15–8–1, as enacted by P.L.1979, ch. 185, § 2.

incurred as a result of the paternity proceedings. *See id.*

Section 15–8–2 of the Act specifically prescribes those persons or parties who are permitted to commence an action thereunder seeking to determine either the identity of a father and to impose upon that father his financial obligations to his child, or to enforce payment of those obligations against a known father. Those specific and prescribed persons are "the father, mother, the child, or the public authority chargeable by law with the support of the child." Section 15–8–2. Rubano clearly is not one of those permitted to proceed under the Act.

This Court in *Waldeck v. Piner*, 488 A.2d 1218 (R.I.1985) had occasion to review and pronounce the "unequivocal aim" of the General Assembly for enacting our ULP. We said that its purpose and aim was:

> "to ensure that fathers support their children born out of wedlock. Section 15–8–2 enables the mother, child, or appropriate public agency to bring a complaint to establish paternity, and upon such determination a specified support obligation can attach. The unequivocal aim of this statutory scheme is to provide a mechanism to enforce child support-responsibilities. This act must be distinguished from such legislation as the Uniform Parentage Act, adopted in other jurisdictions, that focuses upon paternity rather than support and establishes parental rights upon a finding of paternity. *** [T]he purpose of the Uniform Paternity Act is child support ***." *Waldeck*, 488 A.2d at 1220–21.[19]

Accordingly, I respectfully suggest that the majority's conclusion that jurisdiction exists in the Family Court to adjudicate Rubano's novel complaint filed pursuant to § 15–8–26 of the ULP, misinterprets both the nature of her complaint and the nature of the ULP.[20] First, it completely ignores the specific statutory mandate contained in § 15–8–2, which designates only those persons or agencies that can qualify as an interested party permitted to file and bring a paternity action in this state. Second, it misinterprets completely the intended purpose of the wording contained in the last sentence of § 15–8–26, which provides that the provisions of the ULP pertinent to the father and child relationship are applicable to an action commenced by "[a]ny interested party *** to determine the existence or nonexistence of a mother and child relationship."

The particular wording of § 15–8–26 was obviously enacted to provide for those infrequent occasions when, for example, a young child who may be living with a single father, or in a foster home, may have need, or want, to have his or her maternal relationship determined. Section 15–8–26 permits an interested party to bring such an action for and on behalf of that child. Such an action would be foreseeable when, for example, the determination of a child-mother relationship would be necessary to entitle the child to inherit from his or her mother in those cases where the child never knew or lived with the mother. Another example would be where a child might seek to obtain standing to commence a wrongful death action as a lawful heir of a mother who has died as a result of an accident. In addition, there very well could be other occasions when a child, who despite never having known his or her biological mother, might

**19.** In a footnote, the majority states that even though the ULP "does give the Family Court authority to make and enforce support orders, *it is not so limited by its terms.*" This directly contradicts its earlier statement that the Family Court "has no more powers than those expressly conferred upon it by the Legislature." It also completely contradicts *Waldeck v. Piner*, 488 A.2d 1218 (R.I.1985).

**20.** It should be noted that § 15–8–26 in our Uniform Law on Paternity Act is not taken from the Uniform Laws Annotated version of the Uniform Law on Paternity; instead, it is taken from the Uniform Parentage Act. *See* Uniform Parentage Act, 9B U.L.A. § 21 at 334 (1987).

wish to determine the existence of that maternal relationship. Those referenced situations are examples of what I conclude was both the reason and the purpose intended for the inclusion of the mother-child relationship language contained in § 15–8–26, and not, the tortured contention proposed by the majority, that permits anyone to intrude upon an already established biological mother and child relationship.[21]

The majority, it appears, has seen fit to mix together portions from the broad statutory language found in § 8–10–3(a) dealing with the Family Court's general jurisdiction over "matters relating to adults who shall be involved with paternity of children born out of wedlock[,]" with the general statutory wording found in § 15–8–26 of the ULP, providing that "[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship" to justify their conclusion that the Family Court possesses jurisdiction over Rubano's complaint for visitation rights. I view that as a strange mix.

The majority seeks to justify its ULP Family Court jurisdiction position by simply declaring that "we have determined that a statutory basis does exist for Rubano's visitation claim under the ULP and that no other statute bars her from seeking such rights." That contention overlooks and completely ignores § 15–8–2 in the ULP That section permits complaints pursuant to the ULP to be brought in the Family Court *only* by "the father, mother, the child, or the public authority chargeable by law with the support of the child."

No matter how hard the majority tries, it can never squeeze Rubano to fit into any one of those permitted complaint categories mandated by the ULP.

As I read the ULP, and in particular the very first section of that Act, § 15–8–1, entitled "Obligations of the father," in conjunction with § 15–8–2, providing for who may commence a proceeding under the Act, and with § 15–8–7, setting out the particular relief that is available to that person or public agency, all roads from § 15–8–1 lead directly to the *"father"* of any child born in, or out of wedlock, including "a child born to a married woman by a man other than her lawful husband." Section 15–8–1. By no stretch of the imagination, judicial or otherwise, can I perceive of Rubano as being one of those persons or public agencies within the purview of the Act that has requisite standing to commence an action in the Family Court to determine the existence of an alleged mother and child relationship between her and the biological minor child of DiCenzo.

All of the provisions in the Act applicable to "the father and child relationship" concern only natural (or biological) fathers, and fathers "presumed to be the natural [or biological] father of a child[.]" *See* § 15–8–3. Assuming that it is "practicable"[22] to apply the "presumption of paternity" criteria contained in § 15–8–3 for purposes of determining the existence of a mother and child relationship, there still remains the fact that, as my colleagues aptly point out, the Legislature specifically "exclude[d] nonbiological parents from its provisions" by restricting its applicability

---

**21.** In a footnote, the majority contends that *West v. Superior Court (Lockrem)*, 59 Cal. App.4th 302, 69 Cal.Rptr.2d 160 (1997), a case upon which I rely, attempts to limit the "any interested person" language of § 15–8–26 to apply only to biological mothers. *West* does not make such a limitation; rather, it recognizes the obvious, that "[a]s an 'interested person' [a] biological mother [is] entitled to bring an action to determine whether [her] former lesbian partner possesse[s] a mother-child relationship with the child." *West*, 69

Cal.Rptr.2d at 162. The California Court then found that "[a]s a person unrelated to [the child], [the biological mother's former lesbian partner] is not an 'interested person'" and, therefore, does not possess statutory standing. *Id.* Nowhere does the California Court preclude others, such as the child or the biological father, from bringing an action under the statute.

**22.** *See* § 15–8–26.

to presumed "natural [mothers]." Consequently, their assertion that the Legislature did not use appropriate limiting language to exclude nonbiological parents from the provisions of § 15–8–26 is unavailing.

The majority, it appears, somehow seems to interpret the wording "any interested party may bring an action to determine the existence" of a mother and child relationship as permitting the Family Court to exercise jurisdiction over Rubano's unique and novel complaint seeking visitation rights with DiCenzo's minor child. See § 15–8–26. While this Court has never had occasion to interpret that particular wording, identical wording is found in the California Uniform Act and has been interpreted by the California Appellate Court.

In West v. Superior Court (Lockrem), 59 Cal.App.4th 302, 69 Cal.Rptr.2d 160, 162 (1997), the California Appellate Court construed the identical language as meaning and permitting only a "biological mother," and not a former lesbian partner, to bring an action to determine the existence of a mother and child relationship. That interpretation, it appears to me, totally comports with the purpose intended by our General Assembly when enacting our ULP, and with this Court's previous holding in Waldeck.[23]

I also find nothing in Pettinato v. Pettinato, 582 A.2d 909 (R.I.1990), that serves to assist the majority's attempt somehow to draw from that case relevant support for their Family Court jurisdiction response to certified question II. Unlike the particular fact situation present in this proceeding, the Family Court's jurisdiction in Pettinato was, in the first instance, based upon and established by virtue of Mr. Pettinato's filing a petition for absolute divorce from Mrs. Pettinato. See id. at 910. The equitable estoppel doctrine employed by this Court in Pettinato was invoked against Mrs. Pettinato only to prevent her from attempting to assert her right to employ results of genetic blood testing, permitted by § 15–8–11 of the ULP, to illegitimize a child that had been presumed to be the child of Gregory Pettinato pursuant to G.L.1956 § 15–8–3. This section presumed a man to be the natural father of a child if, after the child's birth, he and the child's natural mother have married, and, with his consent, he is named as the child's father on the child's birth certificate. It was undisputed that Gregory Pettinato had met all of the requirements to trigger the presumption of paternity. The genetic testing evidence would have been in derogation of this presumption which was designed primarily to protect the legitimacy of the child. The presumption of legitimacy is "one of the strongest and most persuasive known to the law." In re Findlay, 253 N.Y. 1, 170 N.E. 471, 472 (1930); see also Miscovich v. Miscovich, 455 Pa.Super. 437, 688 A.2d 726, 729 (1997). In Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), the United States Supreme Court noted that the primary rationale underlying the legitimacy presumption has been "an aversion to declaring children illegitimate *** thereby depriving them of rights of inheritance and succession *** and likely making them wards of the state." Id. at 125, 109 S.Ct. at 2343,

---

**23.** The majority cites to V.C. v. M.J.B., 163 N.J. 200, 748 A.2d 539 (2000) to support its recognition of the existence of "psychological parenthood." Although the New Jersey Supreme Court did recognize such a phenomenon, it also recognizes the validity of West v. Superior Court (Lockrem), 59 Cal.App.4th 302, 69 Cal.Rptr.2d 160 (1997). In footnote 5 the New Jersey Court Supreme Court states:

"The legislative grant of power is what distinguishes this case from West v. The Superior Court of Sacramento *** cited by M.J.B. for the proposition that we lack jurisdiction over V.C.'s claim. Each of those cases was decided based on an absence of legislative authority evidenced by a legislative scheme that did not include the kind of language employed here." V.C., 748 A.2d at 548, n. 5.

Here, the statutory distinction noted by the New Jersey Court serves as the basis for rejecting Rubano's claim.

105 L.Ed.2d at 107. A secondary rationale, the Court noted, was "the interest in promoting the 'peace and tranquillity of States and families.'" *Id.* In *Miscovich,* it was noted that "[t]he presumption that a child born during a marriage is a child of the marriage 'arose from the reluctance of the law to declare a child "illegitimate," because the status "illegitimate" historically subjected a child to significant legal and social discrimination.'" *Miscovich,* 688 A.2d at 728. For example, illegitimate children were precluded from, among other things, entering certain professions, and were considered non-persons and not entitled to support from the father or inheritance from either parent. *See id.* at 728 n. 2.

The law still retains "a strong bias against ruling the children of married women illegitimate." *Michael H.,* 491 U.S. at 125, 109 S.Ct. at 2343, 105 L.Ed.2d at 107. In *Michael H.,* the plaintiff sought to establish paternity to a child that was born of a woman who was married to another man. Despite the fact that blood tests indicated a 98.07 percent probability that Michael was the father, and the fact that Michael had established a parental relationship with the child, the Court recognized the woman's husband as the presumptive father of the child. "[E]ven in modern times—when *** the rigid protection of the marital family has in other respects been relaxed—the ability of a person in Michael's position to claim paternity has not been generally acknowledged." *Id.* The Court held that to establish paternity, Michael "must establish *** not that our society has traditionally allowed a natural father in his circumstances to establish paternity, but that it has traditionally accorded such a father parental rights, ·or at least has not traditionally denied them." *Id.* at 126, 109 S.Ct. at 2344, 105 L.Ed.2d at 108. The Court held that no case had yet done so. *See id.*

The *Pettinato* court's use of equitable estoppel as a shield to prevent Mrs. Pettinato from attacking the presumption of paternity created by § 15–8–3 was for a totally different purpose than that for which the majority now attempts to employ equitable estoppel against DiCenzo, namely, to create jurisdiction in the Family Court over Rubano's complaint seeking visitation rights to a minor child against the wishes of DiCenzo, the child's biological mother. Consequently, *Pettinato* provides utterly no support for the majority's assertion that the Family Court has jurisdiction to entertain a petition for visitation by Rubano.

I submit that the majority's response to certified question No. II fails to recognize that the statutory restrictions placed upon the Family Court's special and limited jurisdiction cannot be avoided by estoppel. Additionally, the true purpose for application of principles of estoppel, including equitable estoppel, "'is to prevent the assertion of what would otherwise be an unequivocal right *** [and] operates always as a shield, never as a sword *** [A]nd it does not of itself create new rights,'" including the creation of rights to custody or visitation. *In re Z.J.H.,* 162 Wis.2d 1002, 471 N.W.2d 202, 212 (1991) (quoting *Utschig v. McClone,* 16 Wis.2d 506, ·114 N.W.2d 854, (1962)). *See also* 28 Am. Jur.2d *Estoppel and Waiver,* § 31 (2000). In responding to certified question No. II, I believe that the majority is attempting to employ its equitable estoppel theory, not as a shield as in *Pettinato,* but instead to create a sword for Rubano to enable her to cut through § 8–10–3 and § 15–8–2, and slash her way through the jurisdictional doors of the Family Court. Equitable estoppel had not been employed for that purpose by the Court in *Pettinato,* nor has it been so employed by any other court as revealed by my research on that subject matter .[24]

---

**24.** It is noteworthy that although the majority agrees that *"generally speaking,* the estoppel doctrine acts as a legal shield rather than a

sword" (emphasis added), it does not cite to any cases to support its suggestion that there

The majority points out that in 1995 the Wisconsin Supreme Court overruled *In re Z.J.H.,* (*see In re H.S.H.–K.,* 193 Wis.2d 649, 533 N.W.2d 419 (1995)), and then concluded that public policy considerations do not prohibit a court from relying on its equitable powers to grant visitation on the basis of a co-parenting agreement. I would remind the majority that the latter case did not vitiate the persuasive admonition of the court in *In re Z.J.H.,* when it observed that the legal effects and consequences of statutory limitations cannot be avoided by estoppel. In short, it is almost self evident that a court's jurisdiction cannot be expanded or diminished by an estoppel relating to one of the litigants. Moreover, I would further remind the majority that the Wisconsin Supreme Court in *In re H.S.H.–K.,* was commenting upon the equitable powers of the circuit court of Wisconsin, which is a trial court of general jurisdiction. Here, the dissenters clearly acknowledge the jurisdiction of the Superior Court to consider the enforcement of an agreement made between the parties.

**(b)**

**The Factual Considerations**

In addition to the foregoing legal and statutory considerations, there also are additional factual matters present in this case that dictate my position concerning the absence of Family Court jurisdiction over Rubano's complaint under the ULP. The first factual issue is the so-called consent order that the majority erroneously refers to as having been entered by a Family Court judge following a "determination made by the justice that Rubano's visitation rights" with DiCenzo's biological child were "in the best interests of the minor child." No such determination ever was made by the trial judge; instead, that determination had been made by the parties themselves in paragraph 10 of the private agreement between Rubano and DiCenzo.

Although the Family Court Chief Judge did permit entry of the consent order embodying the private agreement between Rubano and DiCenzo, a reading of the transcript of the December 2, 1997, contempt motion hearing reveals both the true genesis of the "best interests of the minor child" language referred to by the majority, as well as the total absence of any input, participation, or findings concerning the consent order by Family Court Chief Judge. Indeed, the Family Court Chief Judge actually disclaimed the consent order in question. He said "it wasn't the Court that entered the Order." Rather, he said it was "a consent order entered by the parties on the 19th day of May 1997." He also said he never participated in the discussion between the parties about their scheduling visitation rights, and further noted that the visitation scheduling was "strictly done by the parties without the assistance of the Court." The so-called consent order in question certainly does not constitute "[a]n agreement of settlement with the alleged father" of the child involved in this unfortunate tug-of-war between Rubano and DiCenzo so as to comply with § 15–8–21 in the ULP, and despite the attempt by the majority to ignore reality, the so-called consent order was simply entered, but never "approved" by the Family Court as required by § 15–8–21.

My colleagues, I believe, are mistaken in writing that the Family Court Chief Judge reviewed and approved the terms of the consent order, and determined that such visitation rights "were in the best interest of the minor child." The text of the transcript concerning the Family Court Chief Judge's statement is appropriately noted.

"THE COURT: \*\*\* Now, we have Plaintiff's supplemental motion to adjudge the Defendant in contempt down today as well as objection filed by [defense counsel]. The Court must first indicate to the parties this matter was done by a consent order entered by the

---

are occasions when the estoppel doctrine properly may be used as a sword.

parties on the 19th day of May 1997. It wasn't the Court that entered the order. It was the parties that came before the Court, and again the Court requested that the matter be certified by the Supreme Court. The parties took the approach they didn't want it certified. They went out and worked out a [visitation] schedule. I don't believe, and [plaintiff's counsel], you can correct me if I am wrong, I don't believe I participated in the discussion as far as visitation.

MS. DICRISTOFARO: No, Your Honor. I believe we informed you of our discussion.

THE COURT: You came back to me and said you worked it out. I don't think I set any time of day.

MS. DICRISTOFARO: Absolutely not, Your Honor.

THE COURT: It was strictly done by the parties without assistance of the Court, although the Court asked for a question to be certified, and the parties decided not to do it."

Thus, it appears from my reading of the transcript of the contempt proceedings that the Family Court Chief Judge simply entered the consent order prepared by the parties, at most, after only a cursory and exiguous reading of its contents. I also am hard-pressed to believe that had he carefully read the proposed consent order, he would have approved of its *paragraph 8*, wherein the visitation rights given to Rubano appear to be not only *assignable*, but also inure to her *heirs and successors*. I would additionally point out that although the majority believes that Rubano has requisite standing to have her claim adjudicated in the Family Court, Paragraph 9 in both her private agreement with DiCenzo and in the consent order specifically negate any such right that she now might claim to any parental relationship with the minor and biological child of DiCenzo.

Paragraph 9 in both documents provides that Rubano "now and forever, waives any claim or cause of action she has or may have to recognition as a parent of the minor child." That express waiver, I believe, although premised upon her having rights of visitation with the child, eliminates any present right that she might now claim to a parental relationship with the child under the ULP. In any event, whether the Chief Judge of the Family Court entered the consent order after a cursory or comprehensive reading could have no effect whatever upon the jurisdiction of the Family Court. No doctrine is more well established than that which unequivocally states that the parties may not confer jurisdiction upon a court by agreement. *See Paolino v. Paolino*, 420 A.2d 830, 833 (R.I.1980).

Although I disagree with the majority, who believe that Rubano has requisite standing to have her claim adjudicated in the Family Court, I do agree that she retains her right to proceed directly against DiCenzo in a *civil action* to enforce her private agreement with DiCenzo. The validity of that agreement, while questionable, has not yet been officially challenged and remains a justiciable issue until determined otherwise.

Considering all the above, I would thus respond to the entirety of certified question No. II in the negative. That response, I suggest, would not in any manner intrude upon, or deprive Rubano of her right to litigate any claim that she may believe she has arising from the agreement that she entered into with DiCenzo, and would not serve to violate Rubano's rights under article 1, section 5, of the Rhode Island Constitution. Article 1, section 5 provides in pertinent part:

"Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character."

If, as I have noted earlier, Rubano believes that she has a valid and enforceable contract with DiCenzo, and if she believes

that DiCenzo has breached that contract, Rubano has the same right as any other similarly situated person to file a civil action in the Superior Court for breach of that contract and for specific performance of the contract, pursuant to G.L. §§ 8–2–13 and 8–2–14.

I believe it is essential to point out that the contract in question here is one that is in the nature of a private property settlement agreement that was entered into between Rubano and DiCenzo in the Family Court. The proceeding in that court had been commenced by the filing of a complaint in which Rubano sought to gain visitation rights with the minor and biological child of DiCenzo. Before the hearing on DiCenzo's motion to dismiss that complaint on jurisdictional grounds, the parties, who were never husband and wife, but instead, were former same-sex partners, then entered into the private settlement agreement that was later presented to the Chief Judge of the Family Court. The Chief Judge, without making any findings, simply entered the private agreement in the form of a pro forma consent order. Neither Rubano's complaint, nor her private settlement agreement with DiCenzo, effectively could serve to confer Family Court jurisdiction over Rubano's novel complaint. Jurisdiction cannot be conferred on the Family Court by consent of the parties. *See Paolino,* 420 A.2d at 833. Their private agreement, later set out in the form of a pro forma consent order, was not then, nor is it now, an antenuptial agreement or property settlement agreement. Nor was it a contract "between persons who at the time of execution of [the] contract[ ], were husband and wife or planned to enter into that relationship[;]" thus, it was not a matter over which the Family Court ever had specific and continuing exclusive jurisdiction to entertain pursuant to § 8–10–3. *Attilli v. Attilli,* 722 A.2d 268, 269 (R.I.1999) (quoting *Bowen v. Bowen,* 675 A.2d 412, 414 (R.I.1996)). Accordingly, the Family Court lacked jurisdiction to enforce what was in true nature nothing more than a private agreement that was never part of any divorce petition or decree. *See Abedon v. Abedon,* 121 R.I. 366, 371, 398 A.2d 1137, 1140 (1979). The inclusion of provisions for rights of visitation by Rubano to DiCenzo's minor child in the agreement "[did] not clothe the [F]amily [C]ourt with jurisdiction which it [did] not otherwise have" pursuant to § 8–10–3. *O'Connell v. O'Connell,* 100 R.I. 444, 447, 216 A.2d 884, 886 (1966). *See also Lubecki v. Ashcroft,* 557 A.2d 1208, 1213–14 (R.I.1989).

This Court clearly noted in *Riffenburg v. Riffenburg,* 585 A.2d 627, 630 (R.I.1991), that a private agreement or contract that is not merged into a divorce judgment retains the characteristics of a private contract, and "the remedy for a party aggrieved by nonperformance of the contract is to sue for specific performance in a breach of contract action." *See also Attilli,* 722 A.2d at 269. The consent order embodying the private contract that was entered into between Rubano and DiCenzo in this case, it must be noted, is based entirely upon the unprecedented complaint filed by Rubano, which cannot under any circumstances ever constitute a petition for divorce or separate maintenance, as required by § 8–10–3. Consequently, the alleged contract resulting therefrom can never be merged into any final divorce judgment. Thus, Rubano is left to seek relief for any breach of contract claim she may have against DiCenzo by filing a complaint for damages and/or specific performance in the Superior Court. Because she has that readily available recourse to an adequate judicial forum in this state in which to seek redress for any alleged wrongs done to her, this Court's response in the negative to certified questions Nos. I and II would not serve to deprive Rubano of any rights in violation of article 1, section 5, of the Rhode Island Constitution.

Although I am of the opinion that the agreement between Rubano and DiCenzo, as memorialized by the consent order en-

tered in the Family Court, could be the subject of an action in the Superior Court, I would issue a caveat to that court, with regard to limitations upon its ability to enforce such an agreement.

. In the recent case of *Troxel v. Granville,* —— U.S. ——, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the Supreme Court of the United States, in a plurality opinion, issued some very important admonitions to any court that might consider a right of visitation (contractual or otherwise) to which the biological parent might object. Justice O'Connor, joined by the Chief Justice and Justices Ginsburg and Breyer, invalidated a visitation order entered by the Superior Court of the State of Washington pursuant to a Washington statute that would allow "any person" to petition for visitation rights at any time whenever it would serve a child's best interests. In that case, the grandparents, Jenifer and Gary Troxel, sought the right to visit their two granddaughters who were the biological children of their deceased son. *See id.* at ——, 120 S.Ct. at 2057, 147 L.Ed.2d at 53. The facts of that case are not in any way identical to the facts at bar, but the principles enunciated serve as guidelines for any court that might be called upon to consider a complaint seeking visitation privileges in respect to a minor child whether based on contract or a previous relationship with the biological parent. Justice O'Connor made the following significant comment:

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.' Two years later, in *Pierce v. Society of Sisters,* 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925),

we again held that the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.' We explained in *Pierce* that '[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' *Id.* at 535, [268 U.S. 510] 45 S.Ct. 571 [69 L.Ed. 1070]. We returned to the subject in *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Id.,* at 166, [321 U.S. 158] 64 S.Ct. 438 [88 L.Ed. 645]." *Troxel,* —— U.S. at ——, 120 S.Ct. at 2060, 147 L.Ed.2d at 56–57.

The plurality emphasized that a fit parent should be presumed to act in the best interests of his or her child. *See id.* at ——, 120 S.Ct. at 2061, 147 L.Ed.2d at 58. Any person who seeks judicial intervention to obtain rights of visitation must overcome that presumption. *See id.* at ——, 120 S.Ct. at 2062, 147 L.Ed.2d at 59. The plaintiff in such an action must satisfy the burden of proving that his or her claimed visitation right is in the best interest of the child and that the biological parent in resisting such a right is acting unreasonably. *See id.* at ——, 120 S.Ct. at 2063, 147 L.Ed.2d at 60.

In another position of this somewhat fragmented series of opinions, Justice Souter, who concurred in the judgment, noted the dangers of judicial intervention on the basis of a judicial opinion that it could make a better decision than a child's parent had made. *See Troxel,* —— U.S. at ——-——, 120 S.Ct. at 2066–67, 147 L.Ed.2d at 64. He further admonished

that a "child is not a mere creature of the State." *Id.* at ——, 120 S.Ct. at 2067, 147 L.Ed.2d at 64. To this observation I might add that a child is more than a mere chattel whose fate may be decided by a contract between two consenting adults.

With this caveat, I agree that the Superior Court would have jurisdiction at least to consider such contractual rights as might be advanced in an appropriate action by Rubano against DiCenzo.

### Question III

"If the answer to Question I is in the affirmative, then does a non-biological partner, who has been a same sex partner with a biological mother have standing to petition the Rhode Island Family Court for visitation pursuant to G.L. § 15–5–1 et al. [sic]?"

I would respond to certified question No. III in the negative. The Family Court's jurisdiction to permit rights of visitation to persons other than the biological or adoptive parents of a minor child specifically has been limited to grandparents and siblings of the minor child. *See* G.L. 1956 §§ 15–5–24.3 and 15–5–24.4. There is no provision contained in chapter 5 of title 15 that authorizes former same-sex partners to have the same rights of visitation as permitted to natural parents. Absent that legislative authority, the Family Court, being a court of special and limited jurisdiction, cannot self-expand its jurisdiction, and neither should this Court do so. *See Rogers v. Rogers,* 98 R.I. 263, 267–68, 201 A.2d 140, 143 (1964).

In support of its responses to the certified questions, the majority opinion has cited to various cases. Because I believe that the majority has misconstrued part of the holdings in those cases, I note here each of the distinctions.

The majority cites to *Hoxsie v. Potter,* 16 R.I. 374, 377, 17 A. 129, 130 (1888) to support its assertion that this Court "has exercised equitable jurisdiction over suits involving child visitation and custody." However, it appears that *Hoxsie* may have

been overruled by *Troxel v. Granville,* —— U.S. ——, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In *Hoxsie,* an indigent, widowed mother placed her four children in the care of various relatives. *See Hoxsie,* 16 R.I. at 374–75, 17 A. at 129. When she remarried and became financially able to care for them, she sought their return. *See id.* The respondent refused to return the child that she and her husband were caring for. *See id.* The Court, noting that the mother had three other children and that the respondent was childless, held that the child should remain with the respondent. *See id.* at 377–78, 17 A. at 130. Although no allegations of the mother's unfitness ever were made, and although the Court implied that the mother was fit, the Court found that remaining with the aunt was in the child's best interest. *See id.* This is precisely the type of second-guessing that *Troxel* prohibits.

The majority also cites to *Lubecki v. Ashcroft,* 557 A.2d 1208, 1211 (R.I.1989) to support its proposition that, under its equitable powers, the Superior Court has concurrent jurisdiction to hear cases involving child visitation and custody. This ignores the exclusive jurisdiction granted to the Family Court in such matters where the contested custody and visitation must be related to petitions for divorce. *See* § 8–10–3. That section also grants the Family Court exclusive jurisdiction to hear those matters relating to adults who shall be involved with paternity of children born out of wedlock. Considering that the majority believes that Rubano is "involved" with the paternity of the child, and considering that the Family Court has exclusive jurisdiction over such determinations, it appears that its contention that the Superior Court has concurrent jurisdiction necessarily would fail.

In its opinion, the majority states that:

"in holding, as we do, that the Family Court had jurisdiction to determine [Rubano's de facto parental relationship], *we also join with the High Court* in recog-

nizing that 'persons outside the nuclear family are called upon with increasing frequency to assist in everyday tasks of child rearing,' [*Troxel*,] and that 'the importance of the familial relationship, to the individuals involved and to the society, stems the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children *** as well as from the fact of a blood relationship.' *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 35 (1977)." (Emphasis added.)

That statement is somewhat misleading. By reasserting its holding in the same sentence as unrelated statements made by the United States Supreme Court, the majority seems to imply that the United States Supreme Court directly agrees with, and supports, the majority's holding in this case. That simply is not so.

In *Troxel* the Supreme Court referred only to "relatives" when referring to "persons outside the nuclear family." *Troxel,* —— U.S. at ——, 120 S.Ct. at 2059, 147 L.Ed.2d at 55. The Supreme Court stated that "[t]he nationwide enactment of nonparental visitation statutes is assuredly due, in some part, to the States' recognition of these changing realities of the American family." *Id.* at ——, 120 S.Ct. at 2059, 147 L.Ed.2d at 55–56. The Court then acknowledged that *"grandparents and other relatives undertake duties of a parental nature in many households ***." Id.* at ——, 120 S.Ct. at 2059, 147 L.Ed.2d at 56. (Emphasis added.) The High Court does not mention unrelated third parties when discussing duties of a parental nature. In *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), the High Court addressed the alleged constitutionally protected liberty interests of legal foster parents. Again, no mention of same-sex, de facto parents.

Another case relied upon by the majority is *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). In that case, Michael H. had a child by a married woman. When the child was three years old, Michael sought to establish his paternity. *See id.* at 114, 109 S.Ct. at 2337, 105 L.Ed.2d at 100. The Supreme Court affirmed the California Court of Appeals, which affirmed the trial court's finding that, under the California Paternity Act, the mother's husband was the presumptive natural father of the child. *See id.* at 132, 109 S.Ct. at 2346, 105 L.Ed .2d at 111.

In the present case, the majority appears to be relying on the Supreme Court's footnote statement in *Michael H.,* that states that the " 'unitary family' *** also includes the household of unmarried parents and their children," to support its notion that the parties in this case similarly are "unmarried parents" and, therefore, they come within the definition of a "unitary family." *Michael H.,* 491 U.S. at 123, n. 3, 109 S.Ct. at 2342, n. 3, 105 L.Ed.2d at 106, n. 3. *Michael H.* did not involve homosexual relationships; rather, it involved a paternity challenge. In addition, *Michael H.,* makes no mention of de facto parents and, when taken in its proper context, any reference to parents is limited to natural/biological parents, married or otherwise. Indeed, the Supreme Court states that "California law, like nature itself, makes no provision for dual fatherhood." *Id.* at 118, 109 S.Ct. at 2339, 105 L.Ed.2d at 103. At a minimum, this suggests that the Supreme Court might not approve of dual motherhood.

Another case cited by the majority is *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). *LaFleur* involved a challenge to the constitutionality of mandatory maternity leave rules where pregnant school teachers were forced to take maternity leave for a specified period whether they wished to or not. The "freedom of personal choice in matters of *** family life" to

which this majority refers was the freedom to decide to become pregnant without fear of being penalized. *LaFleur,* 414 U.S. at 639, 94 S.Ct. at 796, 39 L.Ed.2d at 60. In quoting *LaFleur,* the majority omits a critical part of the Supreme Court's statement. The *exact* quote says: "freedom of personal choice in matters of *marriage and* family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 639–40, 94 S.Ct. at 796, 39 L.Ed.2d at 60. (Emphasis added.) It is rather a leap to imply that this statement supports the assertion that Rubano has a constitutionally protected liberty interest in visitation rights with the child.

Finally, the majority relies upon *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), to suggest that DiCenzo's parental rights are not unqualified "because the rights of a child's biological parent do not always outweigh those of other parties asserting parental rights, let alone do they trump the child's best interest." *Lehr* stands for the proposition that a developed, parent-child relationship between an unwed biological parent and his or her child is entitled to constitutional protection. The Supreme Court acknowledged that there is a "clear distinction between a mere biological relationship and an actual relationship of parental responsibility." *Id.* at 259–60, 103 S.Ct. at 2992, 77 L.Ed.2d at 625. The majority uses this quote to support its contention that Rubano's relationship of parental responsibility with DiCenzo's child somehow trumps DiCenzo's objections to Rubano's visitation. However, the Supreme Court's statement was referring to the fact that a mere biological relationship, without more, does not support that parent's claim that he or she has a substantive due process right to maintain a parental relationship. Here, the biological parent, DiCenzo, has a fully developed relationship with her child;

therefore, *Lehr* is not relevant and serves merely to confuse the issue.

Let us consider the implications of the majority's leap to confer jurisdiction upon the Family Court to entertain a petition for visitation by a person who neither has an adoptive nor blood relationship to the child (such as grandparent) based solely upon a prior homosexual relationship with the biological mother. Let us suppose that a man who was not the biological father of a child engaged in a heterosexual relationship with the unmarried mother of such a child. Let us further suppose that this man, the mother, and the child lived together for a period of years as a family unit. During that time, the live-in boyfriend contributed to the support of the child and assumed some of the duties of parenting. Nevertheless, he did not marry the child's mother and did not adopt the child. Would the majority give to this heterosexual partner the right to petition for visitation after the heterosexual relationship had been dissolved? In the event that the biological mother was not unfit and objected to this visitation because she had entered into a new relationship with another partner, would the Family Court have jurisdiction to entertain such a petition?

### Conclusion

For the reasons stated, the Chief Justice and I concur with the majority in answering certified question No. I in the negative; we dissent from the majority in our answers to certified questions No. II and No. III. We would answer certified question No. II in the negative, and we would answer certified question No. III in the negative.